## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM WEISS and ROBERT LESSMAN, and ANN HARRELL and EDDIE HARRELL, individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>       v.<br><br>BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., and BANK OF AMERICA REINSURANCE CORPORATION,<br><br>             Defendants. | Civil Action No.: _____<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>JURY TRIAL DEMANDED |

## <u>INTRODUCTION</u>

1.      Defendants Bank of America Corporation ("BAC"), Bank of America, N.A, ("BoA N.A."), and their affiliated reinsurer, Bank of America Reinsurance Corporation ("BoA RE") (collectively, "Bank of America"), have engaged in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") by effectuating a captive reinsurance scheme which defrauded Plaintiffs William Weiss, Robert Lessman, Ann Harrell and Eddie Harrell (collectively, "Plaintiffs") and the Class (defined below) and compelled them to fund illegal kickbacks and referral payments in the form of purported reinsurance premiums that were paid by United Guaranty Residential Insurance Company, Triad Guaranty Insurance Corporation, Republic Mortgage Insurance Company, Mortgage Guaranty Insurance Corporation, Radian Guaranty Inc., Genworth Mortgage Insurance Corporation, and PMI Mortgage Insurance Company

(collectively, the "Private Mortgage Insurers") to BoA RE.

2.      This is a proposed nationwide action brought by Plaintiffs on behalf of themselves and a class of all other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by BAC and/or BoA N.A. and their mortgage lending subsidiaries and/or affiliates between  January 1, 2004, and the present (the "Class Period") and, in connection therewith, purchased private mortgage insurance and whose residential mortgage loans were included within Bank of America's captive mortgage reinsurance arrangements (hereinafter, the "Class").

3.      Captive reinsurance schemes, such as the scheme involving Defendants described herein, have been widespread throughout the mortgage lending industry.  As *American Banker* magazine reported in connection with an investigation by the Inspector General of the Department of Housing and Urban Development ("HUD"), "beginning in the late 1990s major U.S. banks began coercing [private mortgage] insurers into cutting them in on what would ultimately amount to $6 billion of insurance premiums in exchange for assuming little or no risk."  *See* Jeff Horwitz, *Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction,* American Banker (Sept. 16, 2011, 7:45 PM), http://www.americanbanker.com/issues/176_181/mortgages-reinsurance-deals-kickbacks-HUD-1042277-1.html, attached as Exhibit 1 (hereinafter referred to as "Mortgage Kickback Scheme"); *see also* Jeff Horwitz, *Banks Took $6B in Reinsurance Kickbacks, Investigators Say,* American       Banker       (Sept.       6,       2011,       4:55       PM), http://www.americanbanker.com/issues/176_173/mortgage-reinsurance-respa-kickbacks-hud-investigation-doj-1041928-1.html, attached as Exhibit 2 (hereinafter referred to as "Reinsurance Kickbacks").

4.      As described in greater detail below, this was accomplished through a secretive "pay-

to-play scheme"[1] that utilized carefully crafted excess-of-loss or purported "quota-share" reinsurance

contracts that minimized risk exposure to bands of losses unlikely to be pierced.  Further, as described

below, even with regard to the purported band of exposure, certain lenders, including BAC and BoA

N.A. and their mortgage lending subsidiaries and/or affiliates, insulated themselves from providing

any real reinsurance by: (a) making their captive reinsurance arrangements "self-capitalizing," in that

they were required to put only "nominal initial capital" into the trusts supporting the reinsurance

contracts; and (b) providing no recourse for the failure to adequately fund the trusts.  *See* Mortgage

Kickback Scheme.

     5.      As *American Banker* described such arrangements:

> The banks were supposedly providing catastrophic reinsurance, but
> the policies appeared to render it impossible that they'd ever suffer
> significant losses.  In the event of catastrophic losses, a bank could
> simply walk away from its nominal initial investment and leave the
> insurer to bear the other costs . . . .

*See* Mortgage Kickback Scheme.

     6.      In other words, these lenders—including BAC, BoA N.A. and their mortgage lending

subsidiaries and/or affiliates—were "playing with the house's money" with no risk of meaningful

losses.  As *American Banker* aptly explained:

> If defaults remained low, banks would pocket large premiums
> without paying any claims; if defaults were high, banks' losses would
> be capped at the amount of their small initial investments, plus the
> premiums paid by homeowners and passed along to them by their
> mortgage insurance partners.  In other words, it appeared to be a no-
> lose proposition for the banks.

*See* Mortgage Kickback Scheme.

     7.      In this action, Plaintiffs challenge Defendants' fraudulent scheme, which resulted in

borrowers, like Plaintiffs and the Class, funding kickbacks, referral payments and unearned fee

---

[1]     *Id.*

splits, that were illegal under the provisions of the Real Estate Settlement Procedures Act of 1974 ("RESPA").   Defendants effectuated this scheme by forming a RICO enterprise and thereby committed numerous predicate acts of mail fraud and/or wire fraud, including "honest services" fraud.  Each Defendant participated in the scheme and was a party to the agreement/understanding that the illegal kickbacks would be given and accepted in exchange for the referral of settlement business.

8.      Homeowners who buy a home with less than a 20% down payment are typically required to pay for private mortgage insurance.  *See* http://usmi.org/mi-resources/.  Private mortgage insurance protects the lender in the event of a default by the borrower.  *Id.  See also* Exhibit 3 hereto at 1, Proposed EITF Issue titled "Risk Transfer in Mortgage Reinsurance Captive Arrangements," discussing the purpose of private mortgage insurance.

9.      Pursuant to the agreement or understanding existing among the Defendants and the Private Mortgage Insurers and upon information and belief, Bank of America allocated its mortgage insurance business to the Private Mortgage Insurers on a rotating basis and entered into captive reinsurance agreements with each of the Private Mortgage Insurers.   Borrowers typically had no opportunity to comparison-shop or select the provider of the private mortgage insurance.  *See* Reinsurance Kickbacks ("Banks typically choose the insurance carrier . . . .").

10.     Both at the inception of each borrower's mortgage loan and repeatedly thereafter, Defendants falsely represented and failed to adequately disclose to borrowers the true nature of the captive reinsurance arrangement with the Private Mortgage Insurers.

11.     Borrowers paid their private mortgage insurance premiums (either directly or indirectly, as further described below) to the Private Mortgage Insurers, and in turn, each Private

Mortgage Insurer paid a portion of the borrowers' private mortgage insurance premiums to BoA RE, in the form of purported "reinsurance" premiums.

12.     Each of the Private Mortgage Insurers understood that the Private Mortgage Insurers were also ceding premiums to Bank of America and they did so because agreeing to this apportionment of Bank of America's business was beneficial to them as a whole - assuring them a steady stream of business free from competition.

13.     Bank of America assured itself a benefit from the steady flow of premiums ceded to its captive reinsurer, BoA RE, from the referral of mortgage insurance business to the Private Mortgage Insurers.

14.     Thus, as a result of the agreement/understanding among the parties and Defendants' fraud, which misled borrowers and allowed Defendants' scheme to perpetuate, Plaintiffs and the Class were forced to fund illegal kickbacks from the Private Mortgage Insurers to BoA Re.

15.     While the kickback payments to BoA RE by the Private Mortgage Insurers were purportedly for "reinsurance" services, BoA RE received these payments while assuming very little or no actual risk under its contracts with the Private Mortgage Insurers.  From 2004 through the end of 2011, BoA RE collected from the Private Mortgage Insurers at least $**284.7** million as its "share" of borrowers' private mortgage insurance premiums.  In contrast, BoA RE's "share" of paid claims during this time period was only approximately $39 million.  *See* Schedule F – Part 3 from the 2004-2011 Annual Statements filed with the National Association of Insurance Commissioners ("NAIC") by each of the Private Mortgage Insurers (showing the reinsurance premiums ceded to and the "losses" paid by BoA RE).

16.     As set forth in detail below, Defendants' captive reinsurance and illegal kickback scheme and the false and misleading representations that Defendants made in order to carry out this

scheme were in violation of RICO, 18 U.S.C. § 1961, *et seq.*

17.     In both mortgage documents and periodic account statements that were transmitted to Plaintiffs and the Class by Defendants and/or their agents, Defendants made false and misleading representations, which hid the true nature of the captive reinsurance arrangement and the illegal kickbacks.  As a result of these fraudulent representations, Plaintiffs and the Class were compelled to fund illegal kickbacks and to pay inflated private mortgage insurance premiums.

18.     As such, Defendants' actions constituted mail fraud and/or wire fraud, predicate acts under RICO.  Defendants' scheme further constituted a pattern of racketeering activity, given their repeated fraudulent conduct with respect to Plaintiffs and the Class, which spanned from 2004 to 2009.  As a result of Defendants' fraudulent scheme, Plaintiffs and the Class were injured in their business or property, being forced to fund kickbacks from the Private Mortgage Insurers to Bank of America, in direct violation of RESPA, and by causing a reduction of competition in the mortgage insurance market resulting in increased private mortgage insurance premiums for Plaintiffs and the Class.

19.     Further, Defendants were unjustly enriched through their captive reinsurance arrangement, whereby they received the benefit of illegal kickbacks that were funded by borrowers, like Plaintiffs and the Class, despite Defendants having provided reinsurance services of little or no value.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.  Venue is proper in this district under 28 U.S.C. § 1391(b) as two of the Plaintiffs reside in this district, and/or a substantial part of the events giving rise to the claims occurred in this district.

21.     This Court also has supplemental jurisdiction over Plaintiffs' state law claim pursuant

to 28 U.S.C. § 1367.

## PARTIES

**Plaintiffs**

22.     William Weiss and Robert Lessman obtained a mortgage loan from Defendant Bank of America, N.A., a subsidiary of Defendant Bank of America Corporation, on or about August 31, 2006, for the purchase of their home located in Greensburg, Pennsylvania.  *See* Exhibit 4 hereto, ("Weiss/Lessman Mortgage").  In connection with their loan, Plaintiffs Weiss and Lessman were required to pay for private mortgage insurance in the amount of $25.00 per month.  Upon information and belief, their private mortgage insurer, United Guaranty Residential Insurance Company, was selected by their lender and was a provider with whom Bank of America had a captive reinsurance arrangement.

23.     Ann Harrell and Eddie Harrell obtained a mortgage loan from Defendant Bank of America, N.A., a subsidiary of Defendant Bank of America Corporation, on or about May 23, 2007 for the purchase of their home located in Chesterfield, Michigan.  *See* Exhibit 5 hereto, ("Harrell Mortgage").  In connection with their loan, they were required to pay for private mortgage insurance in the amount of $60.45 per month.  Upon information and belief, their private mortgage insurer, Radian Guaranty Inc., was selected by her lender and was a provider with whom Bank of America had a captive reinsurance arrangement.

**Defendants**

24.     Defendant Bank of America Corporation, a Delaware corporation, is one of the world's largest financial institutions, serving individual consumers, small and middle-market businesses, institutional investors, large corporations and governments with a full range of banking, investing, asset management and other financial and risk management products and services. Its

principal executive offices are located in Charlotte, North Carolina 28255. *See* Exhibit 6 attached hereto (excerpts from Bank of America's 2011 Form 10-K), at 1.

25.     Bank of America, National Association, a national banking association which conducted business in Pennsylvania and throughout the United States was at all times material to the allegations herein a wholly owned subsidiary of Bank of America Corporation and its primary banking subsidiary. *See* Exhibit 7 hereto (excerpts from Bank of America Corporation's 2004 Form 10-K, Ex. 21.01; Exhibit 8 hereto (excerpts from Bank of America Corporation's 2005 Form 10-K, Ex. 21.01); Exhibit 9 hereto (excerpts from Bank of America Corporation's 2006 Form 10-K, Ex. 20.01); Exhibit 10 hereto (excerpts from Bank of America Corporation's 2007 Form 10-K, Ex. 21.01); Exhibit 11 hereto (excerpts from Bank of America Corporation's 2008 Form 10-K, Ex. 21.01; Exhibit 12 hereto (excerpts from Bank of America Corporation's 2009 Form 10-K, Ex. 21.01); Exhibit 13 hereto (excerpts from Bank of America Corporation's 2010 Form 10-K, Ex. 21.01); Exhibit 8 hereto (excerpts from Bank of America Corporation's 2011 Form 10-K, Ex. 21.01). During the relevant time period, as alleged herein, Bank of America, N.A. originated loans home loans throughout the United States. *See* Exhibit 14 hereto (excerpts from Bank of America Corp.'s 2005 Summary Annual Report), at 30; *see also* Exhibit 15 hereto (excerpts from Bank of America 2011 Annual Report), at 152.

26.     Defendant Bank of America Reinsurance Corporation is an active Vermont Corporation and captive reinsurer regulated by the Vermont Department of Banking, Insurance, Securities and Health Care Administration and a subsidiary of Bank of America Corporation for all times material to the allegations herein. *See* Exhibits 6-13 (Bank of America Corporation's 10-K, Ex. 21.01 forms for the years 2004-2011 listing BoA RE, Inc. as a subsidiary of Bank of America Corporation for the years 2004–2011); Vermont Secretary of State Corporation Information attached

as Exhibit 16 hereto; Excerpts from the 2008 Annual Report of the Vermont Insurance Commissioner Year Ended December 31, 2008) attached as Exhibit 17 hereto; Comptroller of the Currency, Corporate Decision #99-05, ("BAC OCC Approval Letter"), approving NationsBank, National Association,[2] to establish Bank of America Reinsurance Corporation to reinsure a portion of mortgage insurance on loans serviced, originated or purchased by the bank) attached as Exhibit 18 hereto.

## FACTUAL ALLEGATIONS

### Bank of America's Mortgage Operations

27.     Bank of America Corporation provides home loan products through a retail network of approximately 5,700 banking centers, mortgage loan officers in approximately 500 locations and a sales force offering customers direct telephone and online access to its products including residential mortgage loans.  *See* Exhibit 15, at 37.

28.     From at least 2004-2011, Bank of America (and its mortgage lending subsidiaries and affiliates), maintained a position of market dominance in the area mortgage origination, ranking as one of the top six mortgage originators every year, achieving the No. 3 spot in 2008 and rising to second in 2009 and 2010.  *See* Exhibit 20 hereto, at 59-71, INSIDE MORTGAGE FINANCE PUBLICATIONS, INC., THE 2011 MORTGAGE MARKET STATISTICAL ANNUAL-VOL. I.

29.     Bank of America N.A. is a federally-chartered national bank through which BAC operates its banking activities.  Bank of America, Bank of America, N.A. and their mortgage lending subsidiaries and/or affiliates, originated and serviced, and, during the Class Period, originated and

---

[2]     On August 17, 1998, NationsBank and BankAmerica merged with BankAmerica Corporation, acquiring BankAmerica Corporation's subsidiary banks, creating Bank of America Corporation.  *See* Exhibit 19, at 2, noting that "the corporation was incorporated in 1998 as part of a merger of BankAmerica Corporation with NationsBank Corporation."  *See also* Board of Governors of the Federal Reserve System, Order, 1998 WL 485366 (F.R.B.) (Aug. 17, 1998).

serviced residential real estate loans throughout the United States.

**Private Mortgage Insurance Industry**

30.     Each of the Private Mortgage Insurers provides or provided mortgage insurance for the protection of residential mortgage lenders such as BAC, BoA N.A. and their mortgage lending subsidiaries and/or affiliates and was a party to a captive reinsurance agreement with BoA RE.

31.     In order to lessen the risk of default, lenders typically prefer to finance no more than eighty percent (80%) of the value of a home, with the remaining twenty percent (20%) being paid as a down payment by the borrower.  In the event of a default, the lender is then more likely to completely recover its investment.

32.     Many potential homebuyers cannot afford to pay 20% of the purchase price as a down payment on a home.  Private mortgage insurance allows the lender to make loans in excess of 80% of the home's value by providing a guarantee from a dependable third party—the provider of private mortgage insurance—to protect the lender in the event of a default by the borrower.  *See* http://usmi.org/mi-resources/.  *See also* Exhibit 3 at 1-2, discussing the purpose of mortgage insurance.

33.     Providers of private mortgage insurance are typically unaffiliated third-party companies who agree to cover the first twenty percent (20%) to thirty percent (30%) of the amount of the potential claim for private mortgage insurance coverage, including unpaid principal, interest and certain expenses.  *See* Exhibit 3 at 1-2.

34.     The amount of private mortgage insurance coverage required varies according to the perceived risk of default.  The lower the percentage of the borrower's down payment, the greater the amount of mortgage insurance required.  For example, more private mortgage insurance is required with a five percent (5%) down payment than with a fifteen percent (15%) down payment.

35.     While the lender is the beneficiary of the private mortgage insurance, the borrower pays for the insurance, either: (a) directly through the addition of monthly premiums to the borrower's monthly mortgage payment, or (b) indirectly through a higher interest rate on the loan (the lender pays the initial private mortgage insurance premium as a lump sum and then passes this cost on the borrower in the form of a higher interest rate for the life of the loan).

36.     Borrowers generally have no opportunity to comparison-shop for private mortgage insurance, as the private mortgage insurance is arranged by the lender.  The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the lender and the provider of private mortgage insurance, rather than negotiated between the borrower and the provider of private mortgage insurance.  *See, e.g.*, Reinsurance Kickbacks ("Banks typically choose the insurance carrier . . . .").

37.     Private mortgage insurance is limited to the conventional home loan market. Mortgage loans directly insured by the federal government via mortgage guaranty programs, such as those maintained by the Federal Housing Administration, maintain their own form of mortgage default insurance.  *See* http://usmi.org/mi-resources/.

**<u>Mortgage Reinsurance</u>**

38.     Beginning in the mid to late 1990s, mortgage companies began looking for ways to capitalize on the booming profitability of the private mortgage insurance market.  *See* Exhibit 21 hereto (Timothy J. Cremin, *Using a Bank Captive Subsidiary to Reinsure Mortgage Insurance*, (Mar. 23, 1998), www.captiveguru.com/mfcms/files/article3_mortgage.pdf).

39.     In order to "share in these profits," lenders typically create reinsurance subsidiaries to enter into contracts with providers of private mortgage insurance, whereby the reinsurer typically agrees to assume a portion of the private mortgage insurer's risk with respect to a given pool of

loans.  *Id.*  In return for guaranteeing a steady stream of business, the private mortgage insurer ceded to the reinsurer a portion of the premiums it receives from borrowers with respect to the loans involved.

40.     Mortgage reinsurance arrangements can generally take one of two forms: (a) "quota share," or (b) "excess-of-loss."

41.     In a typical quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all the private mortgage insurer's insured losses.  Thus, if the private mortgage insurer experiences losses, the reinsurer is expected to experience losses in the percentage agreed upon in the reinsurance contract.  However, quota share arrangements do not constitute real or commensurately priced reinsurance if provisions in the reinsurance contract limit the reinsurer's liability to pay claims to the assets held in the trust accounts established for each mortgage insurer into which the mortgage insurer deposits the contractually-determined ceded portion of the premiums that it collects from borrowers, and the Private Mortgage Insurers have no recourse against the reinsurer.[3]

42.     A quota share reinsurance arrangement between a reinsurer and a private mortgage insurer that does not expose the reinsurer to any real possibility that it may be required to contribute its own money when called upon by the primary private mortgage insurer to pay for its share of losses, is a sham.

---

[3]     As noted by the American Academy of Actuaries:

> Straight quota share contracts are typically exempted from risk transfer requirements under the paragraph 11 exception of FAS 113. However, ***the introduction of risk limiting features*** to a quota share contract***, such as a loss ratio cap*** . . . a loss retention corridor, or a sliding scale commission, often prevents the contract from qualifying for the exception.

*See* Exhibit 22 hereto, January 2007 Reinsurance Attestation Supplement 20-1, at 14 (emphasis added).

43.     In contrast to the typical quota share arrangement, where the private mortgage insurer and reinsurer are *expected* to share losses beginning with the first dollar of loss paid, in an excess-of-loss arrangement, the reinsurer is liable only for a specified corridor or "band" of loss, with the losses below and above the band being covered by the private mortgage insurer.  In other words, the reinsurer is liable only for claims, or a percentage thereof, above a particular point, commonly known as an attachment or entry point, and subject to a ceiling, commonly known as a detachment or exit point.  Under this structure, then, the reinsurer's liability begins, if ever, only when the private mortgage insurer's incurred losses reach the attachment point and ends when such losses reach the detachment point.

44.     An excess-of-loss arrangement does not, however, necessarily result in any actual "losses" being shifted to the reinsurer, even if the reinsurer begins paying claims.  Paid claims, as discussed herein, do not establish that the reinsurance agreements provide for true, and commensurately priced, risk transfer.  Risk/liability/recourse limiting features such as those described herein make any claim of "loss" illusory and purposefully inaccurate.

45.     Under accepted accounting principles, and actuarial principles, for a contract to be treated as "real" risk-transferring reinsurance, the reinsurer must assume significant insurance risk and it must be "reasonably possible that the reinsurer may realize a significant loss."  *See* CAS Research Working Party on Risk Transfer Testing, Risk Transfer Testing of Reinsurance Contracts: Analysis and Recommendations, Casualty Actuarial Society *Forum*, Winter 2006, at 282-283, attached hereto as Exhibit 23; *see generally* Statement of Financial Accounting Standards No. 113, "Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts," (December 1992) at 7, attached hereto as Exhibit 24.

46.     The likelihood of the reinsurer experiencing any real losses (as opposed to merely

paying "claims" from reinsurance premiums/illegal referral payments) under the arrangement depends not only on the amount of losses paid by the private mortgage insurer (*i.e.,* whether the amount of claims paid by the insurer ever reaches the band where the reinsurer's responsibility to pay claims attaches) but also on whether the reinsurance agreement between the reinsurer and the private mortgage insurer exposes the reinsurer to any real possibility that it may be ***required*** to contribute its ***own*** money when called upon by the primary private mortgage insurer to pay for its share of losses.

47.     The absence of any likelihood that the reinsurer will experience real losses, in turn, reveals the reinsurance agreement between the reinsurer and primary private mortgage insurer to be a sham.

**Captive Mortgage Reinsurance Arrangements**

48.     Lenders produce customers for private mortgage insurers.  In the early years of the private mortgage insurance industry, there were no financial ties between lenders and the private mortgage insurers.  *See* Reinsurance Kickbacks.

49.     However, mortgage lenders such as BAC, BoA N.A. and their mortgage lending subsidiaries and/or affiliates, seeking to capitalize on the hundreds of millions of dollars their borrowers pay to private mortgage insurers in premiums each year, entered into a scheme with the Private Mortgage Insurers to establish its own affiliated or "captive" reinsurer and, "[i]n exchange for steering home buyers to the [Private Mortgage] [I]nsurers, [] demand[ed] unjustifiably lucrative [captive] reinsurance deals" with such Private Mortgage Insurers (whose business was dependent upon referrals from the lenders and who initially used reinsurance deals as marketing tools).  *See* Mortgage Kickback Scheme; *see also* Michael C. Schmitz, *Investigating Captive Mortgage Reinsurance,* Mortgage Banking, February 1, 1998, attached hereto as Exhibit 25.

50.     These arrangements require the private mortgage insurer to cede a percentage of the borrowers' premiums to the lender's captive reinsurer for the "reinsurance" purportedly provided. *See* Comptroller of the Currency, Adm'r of National Banks, Activities Permissible for a National Bank, Cumulative, 2011 Annual Edition (April 2012), at 50, attached hereto as Exhibit 26.

51.     Thus, as opposed to receiving direct payments for referring its customers to a certain private mortgage insurer, lenders have utilized carefully crafted reinsurance contracts, as described herein, to funnel unlawful kickbacks from private mortgage insurers to the lenders' captive reinsurance subsidiaries.

52.     Lender captive reinsurers provide reinsurance primarily or exclusively for loans the lender originates, funds and/or originates through correspondent lending and which include private mortgage insurance.  *See* Exhibit 27, at 63 attached hereto (excerpt from "Investment in Subsidiaries and Equities, Comptroller's Licensing Manual"), Washington, D.C., July 2008 ("National banks may reinsure mortgage insurance on loans originated, purchased, or serviced by the bank, its subsidiaries, or its affiliates.").  Under captive reinsurance arrangements, the lender refers its borrowers to a private mortgage insurer who agrees to reinsure with the lender's captive reinsurer.  These arrangements require the private mortgage insurer to agree to cede a percentage of the borrowers' premiums to the lender's captive reinsurer for the "reinsurance" purportedly provided.

53.     Notably, after investigating mortgage lenders' captive reinsurance arrangements with private mortgage insurers, the Office of the Inspector General of HUD concluded that "banks and insurance companies had created elaborate financial structures that had the appearance of reinsurance but failed to transfer significant amounts of risk to their bank underwriters."  *See* Reinsurance Kickbacks.

54.     This is because some lenders, including BAC, BoA N.A. and their mortgage lending

subsidiaries and/ or affiliates, collaborated with private mortgage insurers to create lucrative excess-of-loss and/or quota share reinsurance deals and purposefully designed their reinsurance contracts in such a manner as to receive hundreds of millions of dollars in purported reinsurance premiums, while assuming little or no actual risk.  As American *Banker* reported, "[w]hile designed to look like reinsurance, the deals weren't built to perform like it.  The problem was how they split up the risks and rewards of insuring homeowners' mortgages."  *See* Reinsurance Kickbacks.

55.     Typically, pursuant to the terms of the reinsurance contracts, the premiums ceded by the private mortgage insurers are deposited directly into trust accounts supporting the reinsurance contracts—that is, accounts which hold the funds that are to be used under the reinsurance contracts to pay claims.  *See, e.g.*, Exhibit 3, at 4, discussing the use of a trust fund.

56.     Premiums are ceded into the supporting trusts on a "book year" basis, as described by an American Institute of CPAs ("AICPA") Task Force addressing issues regarding risk transfer in mortgage reinsurance captive arrangements.

> A contract functions at the book year level and is typically for a 10 year term. For example, 1999 is a book year and all mortgage insurance policies written during 1999 would be considered "book year 1" and reinsurance premium and reinsurance losses related to that book year would be ceded to the captive reinsurer for 10 years . . . . Trust funds for all book years for the particular MI cross-collateralize the entire reinsured obligation to the MI.

*See* Exhibit 3 at 3.

57.     Thus, all claims under a reinsurance contract with a particular private mortgage insurer can be satisfied from all the funds in the trust created to support that reinsurance contract, rather than only from premiums ceded for a given book year.  *See* Exhibit 3 at 3.  Moreover, upon information and belief, when certain trust reserve requirements are met, the funds in the trust can also typically be released as dividends to the captive reinsurer.  Thus, the ceded premiums which are deposited into the trusts remain there until they are paid out to cover claims, paid out to cover

administrative expenses incurred by the captive reinsurer, or released as a dividend to the captive reinsurer.

58.     Typically, by design, lenders' captive reinsurance contracts with private mortgage insurers, such as Bank of America's contracts with the Private Mortgage Insurers, limit the lenders' liability/payment responsibilities under the contracts through provisions that permit the captive reinsurer to effectively opt out of the contracts at will by simply failing to adequately capitalize the trust supporting the reinsurance contract.  *See* Reinsurance Kickbacks.

59.     While the captive reinsurer is facially required to maintain the trust fund's net assets at a level required by state law (typically, upon information and belief, 10% of the current cumulative loss exposure for all book years or 100% of loss reserves, including a contingency reserve) through, *inter alia*, capital infusions, this requirement is a chimera as the private mortgage insurers have no monetary recourse against the captive reinsurer or the lender to ensure that the trusts are sufficiently funded on an ongoing basis in order to cover actual or expected losses under the reinsurance contract.  *See* Reinsurance Kickbacks.

60.     Thus, the captive reinsurer's potential exposure for payment of reinsurance claims is commonly limited to the amount held in the trust account established for the mortgage insurer—no matter what state law or regulation, or even other portions of the reinsurance contracts, require.  This is accomplished either through concurrent contractual provisions expressly providing that the captive reinsurer and its affiliates have no exposure for the failure to adequately fund the trusts or through an unwritten understanding of the parties.[4]  *See, e.g.*, Exhibit 28, at 10 (excerpts from MGIC Investment

---

[4]     *See* Exhibit 19 hereto, OCC Corporate Decision #99-05, January 1999, at 4 (affirming that Bank of America's "potential liability for the Subsidiary's [*i.e.,* BoA RE] reinsurance obligation will not exceed [Bank of America's ] investment in the Subsidiary [BoA RE]"; *see also id.* at fn.7, stating, "The Bank's [Bank of America] total exposure to the mortgage reinsurance activities will be limited,

Corporation's 2007 Form 10-K at 10, noting that "[t]he captive's ultimate liability is limited to assets in the trust account."); Exhibit 29, at 23 (excerpts from Genworth Financial Inc.'s 2011 Form 10-K, noting that "[o]nce the captive reinsurance or trust assets are exhausted, we are responsible for any additional losses incurred."); Exhibit 30, at 31 (excerpts from Genworth Financial Inc.'s 2006 Form 10-K, noting "[h]owever, we cannot ensure that each captive with which we do business can or will meet all its obligations to us.").

61.     As *American Banker* aptly described such arrangements:

> And the deals were "self-capitalizing," meaning that a bank could fund its stake with incoming premiums.  If the deal went bad, the bank could walk away and leave the insurer to cover its losses. Conceptually, such arrangements are analogous to letting a gambler with $10 in casino chips place a $100 bet at a blackjack table on the assumption that he'll win.

*See* Reinsurance Kickbacks.

62.     In other words, should the captive reinsurer choose not to maintain the required funds in the trust (as, upon information and belief, Bank of America decided here), once the trust is depleted, the captive reinsurer bears no further risk and the mortgage insurer assumes any remaining obligations—no matter if the funds available in the trusts were not enough to cover the amount of risk or "losses" the captive reinsurer contracted and paid to cover.  The absence of such recourse distinguishes the challenged captive reinsurance contracts from true mortgage reinsurance contracts.

63.     Typically, lenders' captive reinsurance arrangements provide yet another layer of protection from true reinsurance losses, in that:

> Each of a bank's reinsurance vehicles was legally separate not only from the bank's main reinsurance subsidiary but also from all the other funds.  If a reinsurance deal didn't have enough money to pay its obligations, the bank could abandon it and leave the mortgage insurer with the unpaid bill.

therefore, to the amount of its capital investment."

> To carry on the casino analogy above, it would be as if the gambler with $10 in chips were allowed to make that same $100 bet at ten different blackjack tables, collecting on the winning bets and renouncing the losers.

*See* Reinsurance Kickbacks.

64.     Lenders have aggressively pursued such arrangements with private mortgage insurers. As *American Banker* recently reported, "[e]ven as insurers complained they couldn't afford the escalating cost of the reinsurance payments, banks threatened or punished companies that balked at providing them."  *See* Reinsurance Kickbacks.

65.      Captive mortgage reinsurance arrangements, such as Bank of America's arrangements with the Private Mortgage Insurers, which will be discussed in more detail below, thus result in a practice of illegal kickbacks.  Private mortgage insurers are dependent on the lender to obtain business, while the lender is collaborating with the insurer to obtain a share of the premium revenue generated by referral of its borrowers to the private mortgage insurers.  The private mortgage insurer stimulates/guarantees its business by providing a lucrative stream of revenue for the lender via the lender's captive reinsurer.

66.     The Private Mortgage Insurers understood that in order to receive referrals of primary mortgage insurance business, and thus a steady stream of business from mortgage lenders—like BAC, BoA N.A. and their mortgage lending subsidiaries and/or affiliates—that they would have to agree to higher premium cessions and/or kickbacks through reinsurance premiums ceded.  Thus, one of the Private Mortgage Insurers, Genworth, noted in its 2004 Form 10-K filing:

> Starting in late 2003, we generally sought to exit or restructure a portion of our excess-of-loss risk sharing arrangements with premium cessions in excess of 25% to improve profitability.  This resulted in a significant reduction in business from several of these lenders and a reduction in the percentage of primary new risk written that is subject to captive reinsurance arrangements.  ***We then re-evaluated these relationships*** on a case-by-case basis, assessing various factors,

> including ceding terms, attachment points and quality of portfolios.
> As a result, we reinstated or restructured some of these arrangements.

*See* Exhibit 31, at 34-35 (excerpts from Genworth Financial Inc.'s 2004 Form 10-K) (emphasis added).  As discussed in detail below, these "reinsurance" payments and/or kickbacks paid to mortgage lenders for their referral of business to the Private Mortgage Insurers were kickbacks and/or referral fees that are clearly illegal under RESPA.

67.     The Private Mortgage Insurers, however, knew that they had to participate and perpetuate the scheme in order to get more business from lenders, like Bank of America, and, as evidenced herein, they did.  *See, e.g.*, Exhibit 32, at 139 (excerpts from Genworth Financial Inc.'s 2005 Form 10-K, indicating "a decreased demand for mortgage insurance . . . as a reduction in business from some mortgage lenders following our actions to restructure our captive reinsurance arrangements with premium risk cessions in excess of 25%.).  *See also* Exhibit 33, at 66 (excepts from Radian Group Inc.'s 2005 Form 10-K, noting with respect to its ability to participate in and profit from the mortgage insurance business, its competitors include "mortgage lenders that demand increasing participation in revenue-sharing arrangements such as captive reinsurance arrangements.").

68.     Milliman, Inc. ("Milliman"), an actuarial company which, upon information and belief, provided actuarial services to each (or most) of the top lenders and their captive reinsurers with regards to these captive arrangements, provided a diagram as part of a handout during a 2008 seminar for actuaries, the relevant portions of which are summarized below.  For example, the following chart represents the basic and identical nature of the captive arrangements between and among the lenders, their reinsurance subsidiaries, and the private mortgage insurers:



*See* Private Mortgage Insurance: Beyond Carriers and Actuarial Opinions at 13, Prepared for 2008 Casualty Loss Reserve Seminar ("CLRS") by Milliman, available at: http://www.casact.org/education/clrs/2008/handouts/mrotek.pdf.   *See also* http://www.casact.org/ education/clrs/2008/ index.cfm?fa=consess (regarding the 2008 CLRS).

69.     In fact, Milliman actively promoted the establishment of lender captive mortgage reinsurance entities as a money-making enterprise for mortgage lenders.  *See* Exhibit 21.

70.     As actuarial firm Milliman acknowledged, if everything went as planned, the scheme would operate as a perfect kickback: "[i]f actual losses develop to the expected level, the above arrangement, from the lender's perspective, is financially equivalent to receiving a commission or profit sharing equal to a percentage of premium."  *See* Exhibit 21.

71.     Upon information and belief, under the terms of the virtually identical reinsurance contracts entered into between the Private Mortgage Insurers and each of the top lender captive reinsurers in the country, including BAC and BoA N.A., the lenders were protected from any liability beyond their initial capital infusion and bore no real risk.  Most significantly, each of these

reinsurance contracts contained "termination clauses" and "trust caps" which, without a counter-balancing "recourse" provision vis à vis the parent lender to ensure that the private mortgage insurance reinsured through termination would indeed continue to be reinsured—effectively allowed the reinsurer to opt out of the scheme at its choosing and without suffering adverse consequences.

72.    When asked to opine on contracts like those cited above with non-recourse and liability-limiting provisions in the analogous *Moore v. GMAC Mortgage, LLC*, No. 07-cv-04296 (E.D. Pa.) action, Andrew Barile, a noted reinsurance industry expert, stated that he had never, "in all [his] years of experience," seen reinsurance agreements with similar non-recourse/trust cap terms to those in the reinsurance agreements between the lender captive reinsurer and the Private Mortgage Insurers.  *See* Defendants' Reply In Support of Motion to Compel Plaintiffs' Experts to Produce Documents at 7, *Moore* (E.D. Pa. Oct. 12, 2010), ECF No. 144.

73.    Upon information and belief, the private mortgage insurers were selected by the lenders for each borrower on a rotating or modified rotating basis, without regard for generally recognized and legitimate business reasons such as price or better service.

74.    The lenders, their captive reinsurers, and the private mortgage insurers continued these agreements/understandings through 2008 in the midst of the unprecedented mortgage crisis. The "brakes" were only applied to this ongoing scheme after Freddie Mac's announcement that effective June 1, 2008, it would limit the percentage of premiums a mortgage insurance provider could cede to a captive reinsurer by 25%.  *See* Exhibit 34 attached hereto (Freddie Mac Private Mortgage Insurer Eligibility Requirements, dated January 2008).  *See also* http://www.freddiemac.com/news/archives/corporate/2008/ 20080214_capture.html.  This limitation clearly contributed to the decline in profits for lenders and their captives, who, upon information and belief, were receiving a much higher percentage of ceded premiums until that point in time.

75.     These agreements/understandings have come under increasing scrutiny in recent years and have been the subject of subpoenas from states, including Minnesota and New York, as well as the Consumer Financial Protection Bureau and HUD.  *See, e.g.*, Exhibit 35, at 54 attached hereto (excerpt from Genworth Financial, Inc.'s 2008 Annual Report, explaining that its various U.S. mortgage insurance subsidiaries received information requests from the State of New York Insurance Department, the Minnesota Department of Commerce, and HUD); Exhibit 36, at 60-61 attached hereto (excerpts from Radian Group Inc.'s 2009 10-K, explaining that Radian and other mortgage insurers have been subject to multiple inquiries from the Minnesota Department of Commerce relating to their captive reinsurance arrangements, and Radian has also received a subpoena from the Office of the Inspector General of HUD, requesting information relating to captive reinsurance); Jeff Horwitz, *PHH Targeted by CFPB in Reinsurance Kickback Probe,* American  Banker  (Jan.  10,  2012),  http://www.americanbanker.com/issues/177_7/phh-cfpb-reinsurance-1045593-1.html, attached hereto as Exhibit 37 (American Banker also reported that the CFPB, which now administers and enforces RESPA, has launched an investigation into "private mortgage lender and servicer" PHH Corporation's alleged kickback scheme).

76.     As a result of the participation of the lenders, their captives, the Private Mortgage Insurers and third-parties such as Milliman, in this singular scheme, mortgage insurance premiums increased as the entire market was severely impacted.  Consumers thus paid more for mortgage insurance because the price included the kickbacks to lenders.

**Bank of America's Captive Reinsurance Arrangements with the Private Mortgage Insurers**

77.     During the Class Period, in connection with the untold millions of dollars in home loans originated, funded and/or originated through correspondent lending by BAC, BoA N.A. and their mortgage lending subsidiaries and/or affiliates, many of their borrowers paid for private mortgage insurance.

78.     Also during the Class Period, Defendant BoA RE was a party to captive reinsurance arrangements joined by each of the Private Mortgage Insurers.  Pursuant to these virtually identical arrangements, BAC, BoA N.A. and their mortgage lending subsidiaries and/or affiliates referred their borrowers to, and, upon information and belief, allocated referrals on a rotating or other systematic basis having nothing to do with quality of service, price, reputation, performance or other appropriate metric among, the Private Mortgage Insurers who, for their part, agreed to reinsure with BoA RE under carefully crafted reinsurance contracts that provided for no true transfer of risk of reinsurance losses to BoA RE., BAC, BoA N.A. and their mortgage lending subsidiaries and/or affiliates and BoA RE in coordination.

79.     Upon information and belief, BoA RE entered into reinsurance contracts solely with respect to loans originated, funded, and/or originated through correspondent lending by BAC, BoA N.A. and their mortgage lending subsidiaries and/or affiliates during the Class Period.  *See* Exhibit 18, at 4 (OCC Corporate Decision #99-05).

80.     According to the 2011 Mortgage Market Statistical Annual, Volume I,  BoA RE was one of the top lender captives from at least 2004 – 2010 (ranked 6  from 2006 – 2010).  *See* Exhibit 20, at 393-398.

81.     Graphically, the Defendants' agreement/understanding can be depicted as follows:



82.    BAC, BoA N.A. and their mortgage lending subsidiaries and/or affiliates along with the Private Mortgage Insurers effectuated this scheme by defrauding borrowers like Plaintiffs and the Class.

83.    Defendants' scheme, as described herein, included making false and misleading representations regarding this captive reinsurance arrangement in the mortgage documents provided to borrowers like Plaintiffs and the Class.  The scheme also included the provision of misleading representations to borrowers, like Plaintiffs and the Class, in periodic account statements that were transmitted to borrowers by Defendants and their agents.

84.    Thus, Plaintiffs and the Class paid the private mortgage insurance premiums to the Private Mortgage Insurers, despite having no say in the selection of the insurer. The Private Mortgage Insurers then remitted a portion of the borrowers' premiums to BoA N.A. for the

purported reinsurance, with Plaintiffs and the Class having no knowledge of the unlawful kickback scheme.

85.     As described below, Defendants' captive reinsurance arrangement with the Private Mortgage Insurers was in fact a scheme or artifice designed to defraud borrowers, like Plaintiffs and the Class, into funding illegal kickbacks and into paying increased premiums for private mortgage insurance, given that Defendants' coordinated actions resulted in a reduction of competition in the mortgage insurance market.

**BoA RE did not Provide the Private Mortgage Insurers with Real Reinsurance**

86.     As reflected in the table below, from the beginning of 2004 through the end of 2011, BoA RE collected from the Private Mortgage Insurers at least **$284.7** million as its "share" of borrower's private mortgage insurance premiums.  In contrast, its "share" of paid claims from the trust accounts supporting its captive reinsurance arrangements during this time period was only approximately $39 million, as depicted in the chart below.[5]



---

[5]     These figures were obtained from a review of the Schedule F – Part 3 of the Annual Statements for the Private Mortgage Insurers filed with the NAIC for the years 2004 through 2011. Plaintiffs' investigation is ongoing.

87.     As *American Banker* observed with respect to lenders' captive reinsurance arrangements, "[s]ome of the deals were designed to return a 400% profit on a bank's investment during good years and remain profitable even in the event of a real estate collapse." *See* Reinsurance Kickbacks.

88.     Beginning in 2007, the United States experienced one of the worst mortgage meltdowns in recent history.  *See, e.g.*, Katalina M. Bianco, *The Subprime Lending Crisis: Causes and Effects of the Mortgage Meltdown*, CCH Mortgage Compliance Guide and Bank Digest (2008), attached as Exhibit 38.  Thus, it is not at all surprising that claims were paid from the trusts during 2009 and 2010.

89.     The over $284.7 million dollars paid by the Private Mortgage Insurers and collected by Bank of America through its captive reinsurer from the beginning of 2004 through the end of 2011 have clearly not been commensurate to its actual risk exposure.  The Private Mortgage Insurers have paid, and Bank of America has received, over $284.7 million dollars in ceded premiums, while Bank of America bore little or no risk of loss.

90.     The money which Bank of America collected from the Private Mortgage Insurers through BoA RE far exceeded the value of the services, if any, it performed.  There was no real transfer of risk or, at least, not a commensurate transfer of risk given the "price paid" by, or the sheer amount of premium ceded to, the reinsurer.  The amounts paid were simply disguised kickbacks to Bank of America for the referral of borrowers to the Private Mortgage Insurers.

91.     Thus, Defendants' captive reinsurance arrangements were sham transactions, which in essence forced Plaintiffs and the Class to fund the illegal kickbacks and unearned fees, in violation of RESPA.

92.     In addition to forcing Plaintiffs and the Class to fund the illegal kickbacks, these

arrangements kept premiums for private mortgage insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk.  In other words, because the money collected by a lender through its captive reinsurer comes from borrowers' mortgage insurance premiums, borrowers are essentially required to pay for *both* actual private mortgage insurance coverage and private mortgage insurers' unlawful kickbacks to lenders.[6]

93.     Amounts paid to lenders as unlawful kickbacks have become a part of the cost of doing business for private mortgage insurers.  As a result, private mortgage insurance premiums incorporate the payment of such kickbacks—to the detriment of consumers.

**The Kickbacks Paid to Bank of America were Illegal under RESPA**

94.     RESPA is the primary federal law regulating residential mortgage settlement services and/or business incident to real estate settlement services.

95.     RESPA was enacted, in part, to curb the problem of kickbacks between real estate agents, lenders and other real estate settlement service providers and/or providers of business incident to real estate settlement services.  "It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."  12 U.S.C. § 2601(b).

96.     A key component of RESPA is its dual prohibition of referral fees and fee-splitting between persons involved in real estate settlement services.

---

[6]     Indeed, the Reinsurance Kickbacks article by *American Banker* states that according to the Office of the Inspector General of HUD's presentation to the Department of Justice, banks forced borrowers to buy more expensive policies than they needed.  "Nearly all loan files reviewed show borrowers with excessive coverage placed on their loan," the presentation concluded.  *See* Reinsurance Kickbacks.

97.     RESPA Section 8(a), 12 U.S.C. § 2607(a), provides:

No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

98.     RESPA Section 8(b), 12 U.S.C. § 2607(b), provides:

No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

99.     Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section."  24 C.F.R. § 3500.14(c).

100.    The term "thing of value" is broadly defined in RESPA and further described in Regulation X as including:

[W]ithout limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity . . . .  The term payment is used as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

24. C.F.R. § 3500.14(d).

101.    Private mortgage insurance business referred to private mortgage insurers by a lender constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a).  The term "settlement service" is liberally defined in RESPA and Regulation X and includes the "provision of services involving mortgage insurance."  24 C.F.R. § 3500.2(b).

102.    Under RESPA, therefore: (a) Bank of America is prohibited from accepting referral fees from a Private Mortgage Insurer or from splitting private mortgage insurance premiums with the Private Mortgage Insurer other than for services actually performed by the captive reinsurer; and (b) the Private Mortgage Insurers are prohibited from paying referral fees to Bank of America or from paying to Bank of America any split of private mortgage insurance premiums other than for services actually performed by the captive reinsurer.

103.    Each and every premium already ceded to BoA Re by the Private Mortgage Insurers, constitutes a separate illegal kickback and/or referral fee split "incident to or part of a real estate settlement service involving a federally related mortgage loan" in violation of RESPA, 12 U.S.C. § 2607(a).  *See e.g.*, Exhibit 39 (Consumer Financial Protection Bureau Complaint against Radian Guaranty, Inc. ¶¶ 28-31 and Final Consent Judgment and Order).

**Defendants' Use of Interstate Mails and/or Wire Caused Injury to Plaintiffs and the Class**

104.    Defendants' scheme, alleged herein, perpetrated the RICO predicate acts of mail fraud and/or wire fraud, including "honest services" fraud, in violation of 18 U.S.C. §§ 1341 and 1343.

105.    The mail fraud statute reads, in relevant part:

> Whoever, having devised … any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises … [uses the mails in furtherance of the scheme shall be punished by imprisonment or fine or both].

18 U.S.C. § 1341.

106.    The wire fraud statute is in relevant respects identical.  *See* 18 U.S.C. § 1343.

107.    The conduct of Defendants and the Private Mortgage Insurers, as described herein, constituted the execution of a scheme and artifice to defraud Plaintiffs and the Class for the purpose of obtaining money from them to fund illegal kickbacks to Bank of America and to increase

premiums for private mortgage insurance, through the use of the mails and/or wires, in violation of 18 U.S.C. § 1341 and § 1343.

108.    Their use of the mails and/or wires formed a central feature of the scheme and included transmitting borrowers' mortgage documents and periodic account statements via mail, electronic mail, and facsimile, which fraudulently represented or omitted the true nature of the reinsurance arrangement, and in particular the illegal kickbacks that were paid to Bank of America.

109.    Hundreds, and likely thousands, of mortgage documents and periodic account statements have been transmitted to borrowers across state lines.   Each of these statements fraudulently represented the true nature of the reinsurance arrangement and the kickbacks paid by the Private Mortgage Insurers (and funded by borrowers) to Bank of America.

110.    Indeed, Plaintiffs Ann Harrell and Eddie Harrell's and, upon information and belief, Plaintiffs Weiss and Lessman's mortgage documents contain a Risk Sharing Mortgage Insurance Disclosure which does not disclose the nature of the agreements/understandings alleged, or that Bank of America's captive reinsurance arrangements resulted in a financial benefit or kickback to it, but rather misleadingly give the arrangement an outward, though incorrect, appearance of legitimacy:

> Your loan requires primary mortgage insurance ("Mortgage Insurance").  Mortgage Insurance reimburses the lender for losses the lender may incur if you fail to make the payment on your loan as required.   While Mortgage Insurance does not provide a direct monetary benefit to you, it does allow you to obtain a mortgage loan with a lower downpayment or, in the case of a refinance, a larger loan.

> Your lender or a subsequent owner of your loan may, directly or through an affiliated company (the "Reinsurance Company"), enter into a reinsurance or other risk sharing agreement with the insurance company that will be providing Mortgage Insurance covering your loan.

> Under such an agreement, the Reinsurance Company may assume a

portion of the risk associated with such Mortgage Insurance.   In exchange for its assumption of such risk, the Reinsurance Company may receive a percentage of the mortgage insurance premium paid to obtain the Mortgage Insurance covering your loan.  **The reinsurance or other such risk sharing agreement will <u>not</u> increase the mortgage insurance premium you pay or increase the period for which Mortgage Insurance is required.**

*See* Exhibit 40 (Harrell PMI and Risk Sharing Disclosures) (emphasis in original); *see also* Exhibit

41 (Weiss/Lessman PMI Disclosure).

111.    Moreover, Plaintiffs' mortgages contain the following language, which similarly does

not disclose the true nature of the captive reinsurance arrangement:

> Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses.  These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.
>
> …
>
> As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed 'captive reinsurance.'  Further:
>
> **(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

*See* Exhibits 4 and 5 (Harrell Mortgage ¶ 10 and Weiss/Lessman Mortgage ¶ 10) (emphasis in original).

112.    Defendants' statements, as set forth above, were false and misleading for a number of

reasons.  First, as described in detail above, the actual reinsurance services provided by BoA RE

were a sham, with little or no risk being assumed by the reinsurer.  Second, the disclosure does not

alert the borrower to the fact that the private mortgage insurer was selected by Bank of America

because of its willingness to pay kickbacks to BoA RE and to participate in the captive reinsurance scheme. Third, the reinsurance premiums (or kickbacks) from the Private Mortgage Insurers to Bank of America were per se illegal under RESPA. Fourth, as set forth above and in direct contravention to the language of the disclosure, borrowers were forced to pay more for private mortgage insurance because the private mortgage insurance premiums had been inflated by and included the kickbacks to lenders.

113.    The "Affiliated Business Arrangement Disclosure Statement" provided to Plaintiffs and the Class was also false and misleading. In particular, the Affiliated Business Arrangement Disclosure Statement does not list BoA RE as an affiliate or subsidiary. *See* Exhibits 42 and 43 attached hereto (Harrell Affiliated Business Arrangement Disclosure and Weiss/Lessman Affiliated Business Arrangement Disclosure).

114.    In addition to the above disclosures, borrowers received periodic account statements from Defendants and/or their agents. These account statements furthered Defendants' fraudulent scheme, masking and concealing the illegal kickbacks and the inflated private mortgage insurance premiums that borrowers were being forced to pay. *See* Exhibits 44 and 45 (Harrell Statement and Weiss/Lessman Statement).

115.    In particular, these periodic account statements, which were transmitted to borrowers such as Plaintiffs and the Class on a monthly basis, lulled borrowers into a false sense of security and allowed the fraudulent scheme to continue.

116.    Upon information and belief, Defendants and/or their agents transmitted similar false and misleading mortgage documents and periodic account statements to countless other borrowers, including all members of the Class, during the Class Period.

117.    The conduct described above constituted multiple violations of the mail fraud and/or wire fraud statutes, 18 U.S.C. § 1341 and § 1343, which are predicate offenses for purposes of RICO, 18 U.S.C. § 1962(c).

118.    The scheme alleged herein also constituted "honest services" fraud, in violation of 18 U.S.C. § 1346.

119.    The mail fraud and wire fraud statutes make it a crime to, *inter alia*, devise a scheme to deprive another of "honest services."   Specifically, Congress broadened the scope of the mail fraud and wire fraud statutes by enacting 18 U.S.C. § 1346, which provides:

> For the purposes of this chapter [including § 1341 and § 1343], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right to honest services.

120.    At all relevant times, Defendants owed a fiduciary duty to Plaintiffs and the Class to render lending services, and those duties included selecting for borrowers an insurer to provide private mortgage insurance.

121.    Defendants, however, misused their position and thereby breached their obligation to render "honest services" to borrowers.   Indeed, Defendants devised a scheme or artifice to defraud Plaintiffs and the Class of the intangible right to "honest services" by selecting an insurer to provide private mortgage insurance for borrowers based on that insurer's payment of unlawful kickbacks to Defendants.

122.    Defendants further were unjustly enriched and increased their profits by effecting a scheme which deprived Plaintiffs and the Class of the funds that were funneled from the Private Mortgage Insurers to Bank of America in the form of illegal kickbacks.   Defendants benefitted from the illegal kickbacks, despite providing reinsurance services of little or no value.

## CLASS ACTION ALLEGATIONS

123.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1) and/or (b)(3) on behalf of the following Class:

> All other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by Bank of America Corporation, Bank of America, N.A and their mortgage lending subsidiaries and/or affiliates between January 1, 2004 and the present and, in connection therewith, purchased private mortgage insurance and whose residential mortgage loans were included within Bank of America's captive mortgage reinsurance arrangements.

124.    The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

125.    The Class is so numerous that joinder of all members is impracticable.

126.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

127.    Plaintiffs' claims are typical of the claims of the Class.  As alleged herein, Plaintiffs and members of the Class sustained damages arising out of Defendants common course of unlawful conduct.

128.    There are questions of law and fact common to the Class, the answers to which will advance the resolution of the claims of all class members, including but not limited to:

a.    Whether Defendants and the Private Mortgage Insurers constituted an association-in-fact RICO enterprise;

b.    Whether Defendants have engaged in a common scheme, plan and course of conduct to compel borrowers to fund illegal kickbacks thereby, inflating private mortgage insurance premiums;

c.    Whether Defendants' scheme has resulted in inflated private mortgage insurance premiums for borrowers;

     d.     Whether Defendants committed mail fraud, wire fraud and/or "honest services" fraud;

     e.     Whether Defendants have engaged in a pattern of racketeering activity;

     f.     Whether Defendants' captive reinsurance arrangements involved sufficient transfer of risk;

     g.     Whether payments to BoA RE were *bona fide* compensation and solely for services actually performed;

     h.     Whether payments to BoA RE exceeded the value of any services actually performed;

     i.     Whether Defendants' captive reinsurance arrangements constituted unlawful kickbacks from the Private Mortgage Insurers;

     j.     Whether Bank of America accepted referral fees from the Private Mortgage Insurers or a portion, split or percentage of borrowers' private mortgage insurance premiums from the Private Mortgage Insurers other than for services actually performed;

     k.     Whether the Private Mortgage Insurers paid or gave referral fees to Bank of America or a portion, split or percentage of borrowers' private mortgage insurance premiums to Bank of America other than for services actually performed;

     l.     Whether the Private Mortgage Insurers entered an agreement/understanding to funnel kickbacks to Bank of America in exchange for the referral of business;

     m.     Whether Plaintiffs and the Class were forced to fund the kickbacks to Bank of America through their private mortgage insurance premiums;

     n.     Whether Plaintiffs and the Class suffered damage as a result of Defendants' conduct; and

o.      The appropriate measure of damages.

129.    These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.  The basic terms and contours of Defendants' challenged captive reinsurance arrangements are not tied to any specific, individual consumer loan.  Rather, the captive reinsurance arrangements apply to groups or pools of loans.  Further, each and every Class member that Plaintiffs seek to represent was required, as part and parcel of obtaining their Bank of America Corporation, Bank of America, N.A and their mortgage lending subsidiaries and/or affiliates, to pay for private mortgage insurance.  Each and every Class member was directed to obtain private mortgage insurance from one of the Private Mortgage Insurers—each of whom had reinsurance contracts with BoA RE, structured as challenged here, to purchase "reinsurance" on that private mortgage insurance.  The essential and basic terms of each of those "reinsurance" contracts between BoA RE and the Private Mortgage Insurers were, for all intents and purposes, materially the same—and each of the Class members, no matter the Private Mortgage Insurer to whom they were referred, suffered the same harm.

130.    The same common issues predominate with respect to all members of the Class, regardless of whether their loans were originated or funded Bank of America Corporation, Bank of America, N.A and their mortgage lending subsidiaries and/or affiliates or originated through correspondent lending.

131.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have no claims antagonistic to those of the Class.  Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation.  Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

132.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

133.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

134.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## STATUTE OF LIMITATIONS

135.     RICO claims are subject to a four year limitations period, however the limitations period does not begin to run until a plaintiff knew or should have known about their injury.

136.     Moreover, pursuant to *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and its progeny, Plaintiffs and the Class's claims have been tolled from April 5, 2012 through January 13, 2015, during the pendency of *Riddle v. Bank of America Corp., et al.*, No. 12-cv-1740 (E.D. Pa.), which was premised on the same factual basis as the instant Complaint.

137.     For Plaintiffs and Class members who were injured prior to the four years preceding the commencement of the *Riddle* action, the injury discovery rule serves to allow their claims.

138.     Due to the complex, undisclosed and self-concealing nature of Defendants' scheme

which provided for the payment of illegal kickbacks from the Private Mortgage Insurers to Bank of America, Plaintiffs and putative Class members did not and could not have known of information sufficient to enable them to discover the true nature of Defendants' scheme.

139.   Moreover, Plaintiffs and the Class did not and could not have known of Defendants' scheme and the injuries suffered by Plaintiffs and the Class despite their exercise of due diligence, because Defendants knowingly and actively concealed the basis for Plaintiffs' claims by engaging in a scheme that was, by its very nature and purposeful design, self-concealing.  Plaintiffs and the Class did not have sufficient information regarding Defendants' wrongdoing to be on notice of such wrongdoing.

140.   As *American Banker* reported, "making matters worse, banks allegedly forced unknowing consumers to buy more insurance than they needed *and failed to properly disclose the reinsurance contracts*." *See* Reinsurance Kickbacks (emphasis added).  In fact, HUD investigators reported to the DOJ that "[m]ost of the time, lenders did not tell borrowers in advance that their captives were reinsuring the deals . . . [i]n some cases, banks allegedly told customers that the charge for the reinsurance was 'none.'" *Id.*

141.   Plaintiffs were able to discover the underlying basis for the claims alleged herein only with the assistance of counsel.  Otherwise, Plaintiffs and the putative Class members had no basis upon which to investigate the validity of the undisclosed payments from the Private Mortgage Insurers to Defendants for purported reinsurance.  Because Plaintiffs and the putative Class members did not and could not have discovered Defendants' scheme until receiving assistance from counsel, the limitations period did not begin to run until then – February 2012 for Plaintiffs William Weiss and Robert Lessman and October 2012 for Plaintiffs Ann Harrell and Eddie Harrell.  Thus, Plaintiffs and the Class's claims are within the four year limitations period.

142.    On February 11, 2013, Plaintiff Eddie Harrell contacted Bank of America, Green Tree, his loan servicer, and Radian, his private mortgage insurer, in order to inquire as to whether his private mortgage insurance was a part of the reinsurance program.  None of the representatives that he spoke with from Bank of America, Green Tree and Radian could provide him with information about the reinsurance program.

143.    Plaintiffs and the putative Class members reasonably did not, and could not, possess sufficient information to put them on notice of the true nature of Bank of America's captive reinsurance arrangements.  The average homebuyer is neither an insurance expert nor a reinsurance expert.  *See, e.g.*, Reinsurance Kickbacks (noting that even HUD's investigation "may have stagnated because demonstrating that the captive reinsurance amounted to kickbacks would require accounting expertise that the Department does not possess").

144.    Additionally, Bank of America's disclosures clearly misled borrowers.  Specifically, the disclosures misled and failed to reveal, among other things, that the actual reinsurance services provided by BoA RE were a sham, that a private mortgage insurer was selected by Bank of America because of its willingness to pay unlawful kickbacks, that the kickbacks were illegal under RESPA, and that borrowers were forced to pay more for private mortgage insurance because of the kickbacks.  Likewise, a disclosure that states that the reinsurer will assume some portion of the risk associated with a borrower's loan is insufficient to put the average homebuyer on notice that anything improper or actionable may have occurred with respect to that reinsurance.  *See* Exhibits 4, 5, and 40 (Harrell Risk Sharing Disclosure, Harrell Mortgage ¶ 10 and Weiss/Lessman Mortgage ¶ 10).

145.    Lastly, Defendants' failure to disclose, in the Affiliated Business Arrangement Disclosure Statement, that BoA RE as an affiliate or subsidiary is similarly misleading and hides the

true nature of the captive reinsurance arrangement. *See* Exhibits 42 and 43 attached hereto (Harrell Affiliated Business Arrangement Disclosure and Weiss/Lessman Affiliated Business Arrangement Disclosure).

146.    Further supporting that the scheme could not be discovered by Plaintiffs and the Class, upon information and belief, Defendants actively concealed their conduct by providing incomplete and/or inaccurate information to state regulators. As *American Banker* reported:

> All the same, banks persuaded state insurance regulators to sign *off* on the structures. To judge whether the reinsurance agreements were fair, state officials relied in part on actuarial analyses submitted by the banks and insurers.
>
> "Review of these opinions has found them to frequently contain significant defects and omissions which render them inapplicable to the actual reinsurance agreements executed," HUD investigators later concluded.

*See* Reinsurance Kickbacks.

147.    It is unrealistic to expect the Class to be as diligent as state regulatory agencies such as the Minnesota Department of Commerce whose investigation of certain captive mortgage reinsurance transactions involving several of the Private Mortgage Insurers did not begin until around 2007, years after the transactions came into existence. *See* Reinsurance Kickbacks (noting that the Minnesota Department of Commerce began to review the insurance on home loans around 2007 and presented its findings to the Department of Justice in the summer of 2009).

148.    Despite years of investigation, it took the Federal Government until 2012 to publicly announce its investigation into captive reinsurance arrangements. Indeed, the Director of the Consumer Financial Protection Bureau, Richard Cordray, when subsequently announcing enforcement actions against some of the Private Mortgage Insurers, stated that, "[h]omeownership is difficult and expensive enough for most people without extra costs imposed by financial kickbacks that are kept hidden from them." *See* Exhibit 46(April 4, 2013 Prepared Remarks of Richard

Cordray).

149.    Further, upon information and belief, BoA RE and other captive reinsurance companies incorporated in "captive-friendly" states and are not required to file with the NAIC the type of detailed annual reports usually required of commercial insurance companies.  *See* Janis Mara, *Wells Fargo, Citibank Under Investigation in Alleged Kickback Schemes*, Inman News (Mar. 7, 2005), attached as Exhibit 47 ("The annual reports and actuarial reports of Vermont captives are protected by the state's confidentiality laws and cannot be accessed without a court order by anyone other than a regulator."); *see also* Mortgage Kickback Scheme (noting that Vermont ranks among the world's top three domiciles along with Bermuda and the Cayman Islands).   Even the most sophisticated borrower could not, for example, simply contact the NAIC to obtain information on BAC, BoA N.A.'s captive reinsurer.  One would need a subpoena to obtain such information; and to obtain a subpoena, one would have to file a lawsuit.

150.    For instance, HUD investigators have alleged that "Vermont insurance regulators went a step further in enabling the mortgage reinsurance business to flourish," finding that:

> Vermont regulators signed off on actuarial opinions from banks and insurers that failed to accurately describe the terms of the reinsurance deals in question, overpaid banks for the risk they were taking and allowed banks to claim insurance trust accounts were capitalized with money that had been explicitly deemed off-limits for claims-paying purposes.

*See* Mortgage Kickback Scheme (also noting that, when "[f]aced with the prospect of either tacitly admitting that it was not taking on actual risk or filing financial statements that did not conform to accounting guidelines, [Countrywide Financial Corporation's captive reinsurer] Balboa was rescued by Vermont insurance officials.").

## CLAIMS FOR RELIEF

### COUNT ONE
### (VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968)

151.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

152.    Plaintiffs, each member of the Class, and each Defendant are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

**The Enterprise**

153.    For the purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of the Private Mortgage Insurers and Defendants, including their respective officers, directors, employees, agents, and indirect subsidiaries (the "Enterprise").  The Enterprise was separate and distinct from the persons that constituted the Enterprise.

154.    The Enterprise was primarily managed by Bank of America, which organized the fraudulent scheme and procured the involvement of the Private Mortgage Insurers.  Each of the Defendants and each of the Private Mortgage Insurers, however, agreed to, and did, participate in the conduct of the Enterprise and carried out their roles using broad and independent discretion.

155.    The companies and individuals that constitute the Enterprise were associated for the common purpose of defrauding borrowers into funding kickbacks flowing from the Private Mortgage Insurers to Defendants and into paying inflated premiums for private mortgage insurance.

156.    Upon information and belief, the Enterprise has operated since at least 2004, and its operation ceased in 2009.

**Pattern of Racketeering Activity**

157.    At all times relevant, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity, as defined in RICO, 18 U.S.C. § 1961(5), by virtue of the conduct described herein.

158.    The pattern of racketeering activity consisted of mail fraud and/or wire fraud, including "honest services" fraud, in violation of 18 U.S.C. § 1341 and § 1343.  Specifically, Defendants engaged in an intentional scheme or artifice to defraud borrowers into funding kickbacks flowing from the Private Mortgage Insurers to Defendants.  These kickbacks in turn inflated the premiums that borrowers had to pay for private mortgage insurance.

159.    Defendants committed mail fraud and/or wire fraud by virtue of the false and misleading representations contained within the mortgage documents provided to borrowers and the misleading account statements repeatedly and periodically provided to borrowers, which hid the true nature of Defendants' captive reinsurance scheme and lulled borrowers into a false sense of security.

160.    Defendants' conduct included a fraudulent scheme to deprive borrowers of their intangible rights to the Private Mortgage Insurers' "honest services," in violation of 18 U.S.C. § 1346.  Defendants' initial selection of the Private Mortgage Insurers due to their participation in the captive reinsurance scheme violated borrowers' rights to "honest services," and each of the Defendants intentionally and willfully conspired and participated in the "honest services" violations.

161.    It was reasonably foreseeable to Defendants that the mails and/or wires would be used in furtherance of the fraudulent scheme, and the mails and/or wires were in fact used to further and execute the scheme.

162.    The nature and pervasiveness of the Enterprise necessarily entailed frequent mail and/or wire transmissions.  The precise dates of such transmissions cannot be alleged without access to the books and records of Defendants and their agents, however Plaintiffs generally allege that

such transmissions were repeated and regular, occurring in the initial mortgage documents transmitted to borrowers at the time of closing and also in repeated, monthly statements which were transmitted to borrowers thereafter.

163.    For the purpose of furthering and executing their scheme, Defendants regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private commercial interstate carrier.

164.    For the purpose of furthering and executing their scheme, Defendants also regularly transmitted and caused to be transmitted writings and electronic data in interstate commerce by means of wire communication.

165.    Defendants utilized the mails and/or wires for the purpose of furthering and executing their scheme.

166.    The mortgage documents and account statements, examples of which are attached as Exhibits 4, 5, and 40-45, are only a few instances of the pattern of racketeering activity, consisting of mail fraud and/or wire fraud violations, engaged in by Defendants.

167.    Each postal and electronic transmission was incident to an essential part of the scheme, namely to mask the true nature of the captive reinsurance scheme and the funneling of kickbacks from the Private Mortgage Insurers to Defendants.  As detailed above, Defendants engaged in similar activities with respect to each member of the Class.

168.    Additionally, each postal and/or electronic transmission constituted a predicate act of mail fraud and/or wire fraud in that each transmission furthered and executed the scheme to defraud borrowers.

169.     Defendants each participated in the scheme to defraud knowingly, willfully and with a specific intent to defraud borrowers into funding kickbacks, which were illegal under RESPA.

170.     The predicate acts of mail fraud and/or wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).  The predicate acts were not isolated events, but were related acts aimed at the common purpose and goal of defrauding borrowers to fund illegal kickbacks.

171.     Defendants were common participants in the predicate acts.  Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers like Plaintiffs and the Class.

**Injury to Plaintiffs and the Class**

172.     As a direct and proximate result of the violations of 18 U.S.C. § 1962(c) by Defendants, Plaintiffs and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).

173.     In particular, Plaintiffs and the Class were injured by being forced to fund kickbacks that were illegal under RESPA.  The amount of the kickbacks that Plaintiffs and the Class were compelled to fund is quantifiable.  Borrowers, such as Plaintiffs and the Class, received nothing of value in exchange for paying the kickbacks.

174.     Further, Plaintiffs and the Class were harmed in that their private mortgage insurance premiums were artificially inflated as a result of Defendants' conduct.  Congress has already determined that the ***aggregate*** effect of an unlawful kickback/referral arrangement, such as a sham captive mortgage reinsurance arrangement, is to unnecessarily inflate and artificially maintain the costs consumers pay for real estate settlement services.  *See* 12 U.S.C. § 2601(b) ("It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . (2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the

costs of certain settlement services."). Thus, kickbacks and unearned fees unnecessarily and artificially inflate the price of settlement service charges, including private mortgage insurance premiums.

175. Under Defendants' scheme, the mortgage insurance premiums paid by Plaintiffs and the Class necessarily and wrongly included payments unlawfully kicked back to BoA RE that far exceeded the value of any services performed (indeed, there were no services performed in return for this payment).

176. The specific harms identified above have been recognized as widespread in the mortgage lending marketplace. *See generally* Mortgage Kickback Scheme; Reinsurance Kickbacks.

177. Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs and the Class for three times the damages sustained, plus costs of bringing this suit, including reasonable attorneys' fees.

## COUNT TWO
### (CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d))

178. Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

179. RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

180. Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. §1962(c).

181. As set above, at all relevant times, Plaintiffs and the Class members were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

182.    As also set forth above, at all relevant times, Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

183.    Defendants formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of defrauding borrowers into funding illegal kickbacks from the Private Mortgage Insurers to Defendants.

184.    The Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

185.    As set forth above, Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).

186.    Defendants were each associated with the Enterprise and agreed and conspired to violate 18 U.S.C. §1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

187.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to accomplish the objects thereof, including but not limited to the acts set forth herein.

188.    As a direct and proximate result of the overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Class have been injured in their business and property.  In particular, Plaintiffs and the Class were injured by being compelled to fund kickbacks that were illegal under RESPA.

189.     Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT THREE
## (UNJUST ENRICHMENT)

190.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

191.     Defendants, by their actions, benefitted from, and increased their profits by effecting a scheme which deprived Plaintiffs and the Class of the funds that were funneled from the Private Mortgage Insurers to Bank of America in the form of illegal kickbacks.  Defendants benefitted from the illegal kickbacks, despite providing reinsurance services of little or no value.

192.     Defendants accepted and received the benefits of the illegal kickbacks, which were funded by Plaintiffs and the Class.  It is inequitable and unjust for Defendants to retain these monies, which were procured by false and misleading pretenses and representations.

193.     Plaintiffs and the Class are entitles to relief for this unjust enrichment in an amount equal to the benefits unjustly retained by Defendants, plus interest on these amounts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A.     Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class and Plaintiffs' counsel as counsel for the Class;

B.     Declaring, adjudging and decreeing the conduct alleged herein as unlawful;

C.      Awarding Plaintiffs and the Class statutory damages pursuant to RICO, 18 U.S.C. § 1964(c);

D.      Granting Plaintiffs and the Class costs of suit, including reasonable attorneys' fees and expenses;

E.      Granting Plaintiffs and the Class restitution of all improperly collected reinsurance premiums and/or disgorgement of Defendants' ill-gotten gains, plus interest, and imposing an equitable constructive trust over all such amounts for the benefit of the Class; and

F.      Granting Plaintiffs and the Class such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.


Dated:   January 14, 2015                    Respectfully submitted,

**STEPHEN J. O'BRIEN & ASSOC.**

By:  /s/ Stephen J. O'Brien
Stephen J. O'Brien (PA 59204)
650 Ridge Road, Suite 400
Pittsburgh, PA 15205
Telephone: (412) 788-7560
Facsimile: (412 788-7563

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Terence S. Ziegler
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**BRAMSON PLUTZIK MAHLER &
BIRKHAEUSER LLP**
Alan R. Plutzik
2125 Oak Grove Boulevard, Ste. 120
Walnut Creek, California 94598
Telephone: (925) 945-0200

**BERKE, BERKE & BERKE**
Ronald J. Berke
420 Frazier Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 266-5171

*Attorneys for Plaintiffs and the Proposed Class*

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated:  January 14, 2015

**STEPHEN J. O'BRIEN & ASSOC.**

By:  /s/ Stephen J. O'Brien
Stephen J. O'Brien (PA 59204)
650 Ridge Road, Suite 400
Pittsburgh, PA 15205
Telephone: (412) 788-7560
Facsimile: (412 788-7563

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Terence S. Ziegler
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**BRAMSON PLUTZIK MAHLER &**
**BIRKHAEUSER LLP**
Alan R. Plutzik
2125 Oak Grove Boulevard, Ste. 120
Walnut Creek, California 94598
Telephone: (925) 945-0200

**BERKE, BERKE & BERKE**
Ronald J. Berke
420 Frazier Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 266-5171

*Attorneys for Plaintiffs and the Proposed Class*