**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM WEISS, ROBERT LESSMAN, | ) | |
| ANN HARRELL, and EDDIE HARRELL, | ) | |
| *Individually and on behalf of all others* | ) | |
| *similarly situated*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 15-62 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| BANK OF AMERICA CORPORATION, | ) | |
| BANK OF AMERICA, N.A., and BANK | ) | |
| OF AMERICA REINSURANCE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM ORDER</u>**

William Weiss, Robert Lessman, Ann Harrell and Eddie Harrell ("Plaintiffs") assert class

action claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") at 18

U.S.C. §§ 1961-1968, as well as claims for unjust enrichment, alleging that Defendants engaged

in a conspiracy to defraud home mortgage borrowers into funding sham captive reinsurance

arrangements ("CRAs") through illegal kickbacks.  (Pl.'s Mem. in Opp'n to Defs.' Mot. ("Pl.'s

Resp.") (Doc. 19) at 1).  Specifically, Plaintiffs allege that Bank of America Corporation ("BAC")

and Bank of America, N.A. ("BANA") referred borrowers to private mortgage insurance providers

in exchange for a kickback of the private mortgage insurance payment, funneled through their

affiliated reinsurer, Bank of American Reinsurance Corporation ("BARC").  (Compl. (Doc. 1) at ¶

1).  In reality, however, Defendants did not assume any real risk in exchange for the payments,

thus rendering illusory the reinsurance coverage it assumed.  (<u>Id</u>. at ¶ 6).  Defendants move to

dismiss Plaintiffs' claims as time-barred; for lack of standing; as well as for failure to state a

RICO claim. (Defs.' Motion to Dismiss ("Defs.' Mot.") (Doc. 14)). For the reasons stated below,

Defendants' Motion to Dismiss will be denied.

# I. <u>MEMORANDUM</u>

## <u>BACKGROUND</u>

BAC is a large financial institution that owns BANA, both of which originated the home

loans at issue in this case. (Compl. at ¶¶ 24-25). BARC is a captive reinsurer and also a

subsidiary of BAC. (<u>Id</u>. at ¶ 26). Plaintiffs William Weiss and Robert Lessman obtained a

mortgage from defendant BAC on or about August 31, 2006. (Compl. at ¶ 22). Plaintiffs Ann

Harrell and Eddie Harrell obtained a mortgage loan from defendant BANA on or about May 23,

2007. (<u>Id</u>. at ¶ 23). All four Plaintiffs were required to purchase private mortgage insurance

("PMI") selected by their respective lenders. (<u>Id</u>. at ¶¶ 22-23). Specifically, Weiss and

Lessman's private mortgage insurer was United Guaranty Residential Insurance Company, and

the Harrells' private mortgage insurer was Radian Guaranty Inc. (<u>Id</u>.).

Homeowners who do not make a twenty percent down payment on their homes typically

must buy private mortgage insurance. (<u>Id</u>. ¶¶ 8, 32). This private mortgage insurance protects

lenders if the borrower defaults. (<u>Id</u>.). The borrower typically pays for the private mortgage

insurance, either through monthly premiums added to the mortgage payment or a higher interest

rate on the loan. (<u>Id</u>. ¶ 35). The terms and conditions of private mortgage insurance are set by

the lender and the provider of the insurance. (Id. ¶ 36). According to Plaintiffs, lenders such as

BAC and BANA, along with their affiliated mortgage reinsurer, BARC, falsely represented and

failed to adequately disclose to borrowers the true nature of their captive reinsurance

arrangement with private mortgage insurers. (<u>Id</u>. ¶¶ 9-10).

Lenders, like BAC and BANA, created reinsurance subsidiaries like BARC "to enter into contracts with providers of private mortgage insurance, whereby the reinsurer typically agrees to assume a portion of the private mortgage insurer's risk with respect to a given pool of loans." (Id. ¶ 39). According to Plaintiffs, lenders such as BAC and BANA have used lender-created reinsurance subsidiaries as a mechanism by which to funnel unlawful kickbacks from private mortgage insurers. (Id. ¶ 51).

Defendants agreed to allocate their mortgage insurance business on a rotating basis. (Id. at ¶ 9). "Each of the Private Mortgage Insurers understood that the Private Mortgage Insurers were also ceding premiums to Bank of America and they did so because agreeing to this apportionment of Bank of America's business was beneficial to them as a whole - assuring them a steady stream of business free from competition." (Id. ¶¶ 9-12, 73). Borrowers paid their PMI premiums to their respective private mortgage insurers, who then issued a "purported" reinsurance premium to BARC. (Id. at ¶ 11).

According to the Complaint, said "reinsurance premiums" in fact failed to qualify as such, as the contracts between reinsurance corporations, like BARC, and private mortgage insurers, were structured so that the reinsurer received hundreds of millions of dollars in premiums but assumed little or no actual risk. (Id. ¶ 15, 54). The premiums were placed into a trust but the agreements "limit the lenders' liability/payment responsibilities . . . through provisions that permit the captive reinsurer to effectively opt out of the contracts at will by simply failing to adequately capitalize the trust supporting the reinsurance contract." (Id. ¶ 58). Ultimately, Plaintiffs contend, borrowers paid more for mortgage insurance because the price included the kickbacks to lenders. (Id. ¶¶ 76, 92 ("[T]hese arrangements tend to keep premiums for private mortgage insurance artificially inflated over time because a percentage of borrowers'

premiums are not actually being paid to cover actual risk.  In other words, because the money collected by a lender through its captive reinsurer comes from borrowers' mortgage insurance premiums, borrowers are essentially required to pay for *both* actual private mortgage insurance coverage and private mortgage insurers' unlawful kickbacks to lenders.") (emphasis in original)).

Plaintiffs allege that the scheme perpetrated by Defendants failed to qualify as a genuine, risk-transferring reinsurance agreement between BARC and the private mortgage insurers, and thus constituted an illegal kickback and/or referral fee split in violation of the Real Estate Settlement Procedures Act of 1974 ("RESPA") at 12 U.S.C. § 2607(a).  (Id. at ¶ 103).  Plaintiffs further allege that such actions further constituted "the execution of a scheme and artifice to defraud Plaintiffs and the Class for the purpose of obtaining money from them to fund illegal kickbacks to [Defendants] and to increase premiums for private mortgage insurance, through the use of the mails and/or wires, in violation of 18 U.S.C. § 1341 and § 1343."  (Id. at ¶ 107).  Defendants communicated with Plaintiffs and the Class regularly via "mail, electronic mail, and facsimile," in order to transmit documents that "fraudulently represented or omitted the true nature of the reinsurance agreement, and in particular the illegal kickbacks" that were paid to Defendants.  (Id. at ¶ 108).  Mail and wire fraud are predicate offenses for purposes of the Racketeer Influenced and Corrupt Organizations Act ("RICO") at 18 U.S.C. § 1962(c); Plaintiffs further allege mail and wire "honest services" fraud and unjust enrichment.  (Id. at ¶ 118-119, 122).

Statute of Limitations

RICO claims must be brought within four years of accrual.  Agency Holding Corp. v. Malley-Duff ¶ Assocs., Inc., 483 U.S. 143, 156 (1987).  Plaintiffs claim that although they obtained their mortgages in 2006 and 2007 their claims are timely pursuant to the injury

discovery rule, American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974) ("American Pipe") and/or the doctrine of fraudulent concealment.[1]  (Compl. at ¶¶ 136-39, 146; Pls.' Resp. at 6-13).

According to Plaintiffs, Riddle v. Bank of America Corp, et al., No. 12-cv-1740 (E.D. Pa.), was premised on the same facts as the instant action.  (Id. at ¶ 136).  As such, Plaintiffs' and the Class's claims were tolled during the pendency of that action, from April 5, 2012 through January 13, 2015.  (Id.).  This case was filed on January 14, 2015.

For Plaintiffs and Class members who were injured prior to April 5, 2008 – i.e. over four years prior to the commencement of Riddle – such persons did not and could not have known the nature of Defendants' actions "[d]ue to the complex, undisclosed and self-concealing nature" of their scheme.  (Id. at ¶ 138).  Because Defendants "knowingly and actively concealed the basis for Plaintiffs' claims by engaging in a scheme that was, by its very nature and purposeful design, self-concealing," the reasonable exercise of due diligence could not have brought Defendants' actions to light prior to Plaintiffs' actual discovery.  (Id. at ¶ 138).   Said discovery occurred in February, 2012 for Plaintiffs Weiss and Lessman, and October 2012 for Plaintiffs Ann and Eddie Harrell.  (Id. at ¶ 141).

According to Plaintiffs, Defendants disclosures regarding private mortgage insurance and reinsurance "misled and failed to reveal . . . that the actual reinsurance services provided by [BARC] were a sham, that a private mortgage insurer was selected by Bank of America because of its willingness to pay unlawful kickbacks, that the kickbacks were illegal under RESPA, and that borrowers were forced to pay more for private mortgage insurance because of the

---

[1] Plaintiffs are not explicit about their invocation of the fraudulent concealment doctrine, but the Court infers its applicability from their allegations and arguments which seem to be relevant only pursuant to that doctrine.

kickbacks." (Id. at ¶ 144). Defendants did disclose that a reinsurer would assume some portion of the risk associated with the borrowers' loans. (Id.). Plaintiffs contend that such a disclosure is insufficient to place them on notice of Defendants' potentially actionable wrongdoing. (Id. at ¶ 139, 144). Bank of America did not disclose, in its Affiliated Business Arrangement Disclosure Statement, that BARC was an affiliate or subsidiary; this acted to conceal the "true nature of the captive reinsurance arrangement." (Id. at ¶ 145).

## ANALYSIS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When faced with a motion to dismiss, a court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

i.     Statute of Limitations

Defendants move to dismiss Plaintiffs' RICO claims, at Counts I and II, on the basis that they are time-barred. (Defs.' Mem. of Law in Supp. of Mot. (Doc. 15) ("Defs.' Mem.") at 6-17). In this Circuit, a limitations defense may be raised in a 12(b)(6) motion to dismiss, "but only if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.' 'If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6).'" Robinson v. Johnson, 313 F.3d 128 (3d Cir. 2002) (quoting Bethel v. Jendoco Constr. Corp., 570 F.2d 1168, 1174 (3d Cir. 1978); Hanna v. U.S. Veterans' Admin. Hosp., 514 F.2d 1092, 1094 (3d Cir. 1975)). Dismissal under Rule 12(b)(6) pursuant to a statute of limitations is proper only "where

the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n. 1 (3d Cir. 1994).

A complaint can be dismissed as time-barred "if it is plain on the face of the complaint that the limitations period cannot be tolled" or if plaintiffs fail to "plead the applicability of the [tolling] doctrine." Menichino v. Citibank, N.A., 2013 WL 3802451, *6-7 (W.D. Pa. July 19, 2013) (collecting Third Circuit cases). "[T]o 'plead the applicability' of a tolling doctrine, the face of the complaint must set forth 'sufficient factual matter' to allow the court 'to draw the reasonable inference' that discovery will show that the plaintiff's untimely claim is entitled to tolling." Id. (citing In re Comm. Bank of N. Va., 622 F.3d 275, 301 (3d Cir. 2010); Iqbal, 556 U.S. at 678).

Defendants argue that Plaintiffs' claims are time-barred if they accrued before January 14, 2011 – four years prior to the filing of this action – unless the statute has been tolled. (Defs.' Mem. at 6). Defendants make two arguments: 1) that Plaintiffs' claims accrued prior to January 14, 2011, and 2) that Plaintiffs have failed to establish that an equitable tolling doctrine applies.

According to Defendants, Plaintiffs' claims accrued when they closed their loans, in 2006 and 2007, respectively. (Id.). The Court first addresses Plaintiffs' argument that their Complaint plausibly alleges that the statute of limitations was not triggered until they received notice from counsel, in 2012, pursuant to the "injury discovery rule." (Pls.' Resp. at 6-8). It is well-established that RICO claims accrue when a plaintiff knew or should have known of his injury. Forbes v. Eagleson, 228 F.3d 471, 484 (3d Cir. 2000). Pursuant to the injury discovery rule in civil RICO cases, a court "'must determine when the plaintiffs knew or should have known of their injury,' . . . [and when they knew] or should have known of the source of their injury."

Prudential Ins. Co. of America v. U.S. Gypsum Co., 359 F.3d 226 (3d Cir. 2004) (quoting

Forbes, 228 F.3d 471).  Plaintiffs plead that they did not know of their injury or its source until

February and October of 2012, respectively.  (Compl. at ¶ 141).  Taking Plaintiffs' factual

allegations as true, the question for the Court becomes whether Plaintiffs "should have known"

prior to that.

     Defendants cite two non-binding cases as persuasive authority for the proposition that

"where alleged predicate acts included 'events occurring [at] the closing of a mortgage loan,'

those RICO claims accrue at closing."  (Defs.' Mem. at 7 (quoting Yates v. GMAC Mortg. LLC,

2010 WL 5316550, *3 (N.D. Ga. Dec. 17, 2010)).  Taking Plaintiffs' well-pleaded allegations as

true, each case cited by Defendants is distinguishable from the one before us today, and none

quite stands for the broad legal holding for which Defendants offer it.  First, Robert Yates was a

pro se plaintiff who failed to respond to the defendant's motion for summary judgment, let alone

plead the potential applicability of the injury discovery rule and a delay in the accrual date.

Yates, No. 1:10-cv-02546 (N.D. Ga.).  That court's cursory review of the date of accrual, with

minimal and distinct facts available to it and where no party argued the issues before this Court,

is not persuasive here.  Second, while the District of New Jersey held that plaintiffs' NJRICO

claims accrued at closing, it did so because, "[b]y Plaintiffs' own admission, '[a] cursory review

of the loan documents [at closing] would reveal the predatory lending scheme.'"  Patetta v. Wells

Fargo Bank, NA, 2009 WL 2905450, *6 (D.N.J. Sept. 10, 2009) (quoting the complaint).

Plaintiffs here plead otherwise – explicitly stating that while the mortgage documents reference

the possibility of involvement of an affiliated reinsurance company, such reference did not make

clear to them that said company would assume little to no risk in exchange for kickbacks from

the private mortgage insurers. Defendants have failed to demonstrate that Plaintiffs' claims accrued at the closing of their home loans as a matter of law.

Defendants next argue that Plaintiffs should have discovered the basis for their claim, with reasonable diligence, based on the information disclosed to them in their mortgage documents; in other words, although Plaintiffs did not know of the basis for these claims, they "should have known," after receiving and signing their mortgage documents. (Defs.' Mem. at 7-12). The Court of Appeals for the Third Circuit has held that:

> the dispositive question concerning . . . federal RICO claims. . . is whether plaintiffs were on "inquiry notice" of their injuries. . . . In determining when a RICO claim accrues, we apply an injury discovery rule "whereby a RICO claim accrues when plaintiffs knew or should have known of their injury." As we noted in <u>Mathews</u>, this rule has "both subjective and objective" components and, with respect to the subjective, "a claim accrues no later than when the plaintiffs themselves discover their injuries." However, because the components are disjunctive we first perform an objective inquiry to determine when plaintiffs should have known of the basis of their claims, which "depends on whether [and when] they had sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity." Moreover, plaintiffs have inquiry notice "whenever circumstances exist that would lead a reasonable [borrower] of ordinary intelligence, through the exercise of due diligence, to discovery of his or her injury."

<u>Cetel v. Kirwan Fin. Grp., Inc.</u>, 460 F.3d 494, 506-07 (3d Cir. 2006) (internal citations omitted).

The Court must proceed through a two-step analysis. <u>Id</u>. It is the burden of Defendants to demonstrate the existence of "storm warnings," *i.e.* "any information or accumulation of data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made. This is an objective inquiry and hinges not on a plaintiff's actual awareness of suspicious circumstances or even on the ability of a plaintiff to understand their import." <u>Id</u>. (internal quotations omitted). The standard assumes knowledge of publically available news articles. <u>Id</u>. (citing <u>Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.</u>, 435 F.3d 396, 400 (3d Cir. 2006)). "Once determined, the second step then

shifts the burden to plaintiffs to show that, heeding the storm warnings, they exercised reasonable diligence but were unable to find and avoid the storm." Id.

Defendants argue that "[o]ne need look no further than the allegations in the Complaint and the documents attached as exhibits to determine that Plaintiffs' RICO claim, like a RESPA claim, accrued at closing," as the documents provided to Plaintiffs at closing were sufficient to establish inquiry notice. (Defs.' Mem. at 7). Plaintiffs' loan documents, which they received in 2006 and 2007, contain a "risk sharing mortgage insurance disclosure," informing them that their lender may, directly or through an affiliated "Reinsurance Company," enter into a reinsurance or other risk sharing agreement with the private mortgage insurance company that is insuring their loans. (Id. at ¶ 110, Ex. 40). Defendants posit that this disclosure is sufficient to put Plaintiffs on inquiry notice and charge them with a duty of diligent investigation; they assert that the disclosure of the potential use of an affiliated reinsurance company constituted the accrual of Plaintiffs' RICO claims.[2] (Defs.' Mem. at 7).

Defendants cite two cases to establish that the mortgage documents alone put Plaintiffs on inquiry notice of the instant RICO claim. (Id. citing Cunningham v. M & T Bank Corp, 2015 WL 539761 (M.D. Pa. 2015); Kay v. Wells Fargo & Co., 247 F.R.D. 572 (N.D. Cal. 2007)). The decision of the Middle District of Pennsylvania in Cunningham is inapposite on the question of inquiry notice. Plaintiffs in that case brought a RESPA claim, not a RICO claim, and the court addressed arguments regarding equitable tolling, not a disputed date of accrual of a claim. Cunningham v. M & T Bank Corp, 2015 WL 539761 at *8 ("RESPA simply does not contemplate an inquiry notice or discovery rule element which permits equitable tolling of the

---

[2]  It follows from Defendants' arguments that the statute of limitations, if not tolled, expired on August 21, 2010 for Plaintiffs Weiss and Lessman, and on May 23, 2011 for Plaintiffs Ann and Eddie Harrell.

limitations period.").  Likewise, the District Court for the Northern District of California in <u>Kay</u>

dealt with an alleged RESPA violation, and thus the doctrine of equitable tolling, bypassing any

question of the injury discovery rule and inquiry notice.

The Court is careful not to "conflate the concept of equitable tolling, which governs the

tolling of an already-triggered statute of limitations, with the discovery rule doctrine, which

applies to toll the *accrual* of a claim for purposes of triggering the limitations period."

<u>Cunningham</u>, 2015 WL 539761 at *7 n. 8 (citing <u>Forbes</u>, 228 F.3d at 486) (emphasis in original).

Equally relevant here, the <u>Cunningham</u> court noted that:

> As the <u>Forbes</u> court observed, discovery rule inquiries focus on when the plaintiff
> uncovered the existence of an injury; equitable tolling analyses query when the
> plaintiff became aware of the facts underlying their claim. This distinction is
> crucial here, when plaintiffs seek not to toll the claims accrual date based on a late
> discovery of a latent injury but rather to toll the already-running limitations period
> based on defendants' purported misrepresentations.

<u>Id</u>. (internal citations omitted).[3]

While Defendants refrain from utilizing the phrase "storm warnings," they indeed argue

that there was "'sufficient information' in the public realm to put Plaintiffs on 'inquiry notice,'"

– including publically available news articles, other lawsuits alleging identical schemes, and

governmental investigations into the same.  (Defs.' Mem. at 9-10 (citing <u>Benak</u>, 435 F.3d at 403,

n. 20 ("The filing of related lawsuits can suffice to put plaintiffs on inquiry notice, where the

alleged fraud is similar.") (internal quotations omitted)).  Defendants point to a number of related

---

[3] The Court notes that the parties agree that the "reasonable diligence standard" from the
equitable tolling context applies equally with respect to the injury discovery doctrine.  (Pls.' Not.
of Supp. Authority (Doc. 23) at 1 n. 1; Defs.' Rep. (Doc. 20) at 1-2).  As such, the case law cited
by Defendants relating to the "reasonable diligence" standard discussed in both the equitable
tolling and injury discovery contexts may be applicable to this case, *infra*, with respect to the
Court's discussion of Plaintiffs' reasonable diligence, or lack thereof.  However, the RESPA
cases cited by Defendant are insufficiently similar to support a finding as a matter of law that
Plaintiffs' claims *accrued* at the time of the closing of their mortgages – or even that loan
documents alone constitute sufficient "storm warnings"—which is a separate determination.

lawsuits alleging identical schemes, which were filed as early as 2006. (Id. at 10-11 (citing

Badesha v. GMAC LLC, No. 06-7817 (N.D. Cal. filed Dec. 20, 2006); Alston v. Countrywide

Fin. Corp., No. 06-8174 (C.D. Cal. Filed Dec. 22, 2006); Kay v. Wells Fargo & Co., No. 07-

1351 (N.D. Cal. filed Mar. 7, 2007); Mullinax v. Radian Guar. Inc., 199 F. Supp. 2d 311, 315

(M.D.N.C. 2002) (suit filed in 2000 alleging that reinsurance premiums "translated into a

kickback for the lenders"); Pedraza v. United Guar. Corp., 114 F. Supp. 2d 1347, 1348 (S.D. Ga.

2000) (suit filed in 1999 alleging mortgage insurance "kickback scheme" in violation of

RESPA)).

   Plaintiffs themselves further cite government investigations and news articles which,

Defendants argue, suffice to put a reasonably diligent plaintiff on inquiry notice. (Defs.' Mem.

at 11 (citing Compl.)). Defendants cite a number of 2008 disclosures, articles published before

2008, reports and lawsuits, all of which were available in the public sphere. (Id. at n. 4, 5).[4]

---

[4] "See, e.g., 10-Q, Genworth Fin., Inc. (Mar. 31, 2006), at 49 ("As previously identified, in May
2005, each of our U.S. mortgage insurance subsidiaries received an information request from the
State of New York Insurance Department with respect to captive reinsurance transactions with
lender-affiliated reinsurers and other types of arrangements in which lending institutions receive
from our subsidiary any form of payment, compensation or other consideration in connection
with issuance of a policy covering a mortgagor of the lending institution."); GE to Sell
Remainder of Genworth Stock, WALL ST. J., Feb. 28, 2006 ("The Minnesota Commerce
Department issued the subpoena in January as part of an industrywide review" of "reinsurance
arrangements"); Bob Rayner, SEC hits local firm with a subpoena, Genworth promises it will
fully cooperate with investigation, RICHMOND TIMES-DISPATCH (May 13, 2005)
("Reinsurance is intended to help manage an insurer's risk, but investigators have alleged that
some companies . . . [made] deals where risk is not actually transferred from one insurer to
another.").

PHH Mortgage: Faces California Lawsuit Over Illegally Split Fees, CLASS ACTION
REPORTER, July 17, 2008 (reporting allegations that captive reinsurance arrangements were
part of a "conspiracy to circumvent RESPA's prohibition against kickbacks"); Wells Fargo:
Accused of Taking Kickbacks for Mortgage Insurance, CLASS ACTION REPORTER, Mar. 11,
2008 (same); Kenneth Harney, New Rules Put Spotlight on Insurance-Fee Splits, CHI. TRIB.,
Feb. 24, 2008, at 33 (reporting that under "captive reinsurance arrangement[s]," "lenders
clamored for—and got—splits of consumers' premiums that appeared unlikely to be paid back

Given the bounty of information in the public domain dating back to 2008 – at the latest – the Court finds that pursuant to the objective standard, Defendants have met their burden of establishing the existence of "storm warnings."  Cetel, 460 F.3d at 507.

As stated *supra*, once the Court finds that the first prong of the inquiry notice test is established, "the second step then shifts the burden to plaintiffs to show that, heeding the storm warnings, they exercised reasonable diligence but were unable to find and avoid the storm," *i.e.*, to discover their injuries.  Id.  Defendants rely heavily on an unpublished decision from the Court of Appeals for the Third Circuit, Riddle v. Bank of America Corp., 588 Fed. App'x 127 (3d Cir. 2014), to establish that Plaintiffs failed to exercise reasonable diligence in the discovery of these claims.  (Defs.' Mem. at 8-12, Defs.' Reply (Doc. 20) at 2-3).  However, after the majority of briefing on Defendants' Motion to Dismiss, Plaintiffs filed a Notice of Supplemental Authority (Doc. 23) calling the Court's attention to a post-Riddle, precedential decision that clarifies the meaning of "reasonable due diligence" in the context of equitable tolling, which applies in the injury discovery context as well.  In re Comm. Bank of N. VA Mortg. Lending Practices Litig., 795 F.3d 380 (3d Cir. 2015) ("Community Bank III").

The Community Bank III court held that, while "reasonable diligence is a fact-specific inquiry," it is also the case that "when a wrongful scheme is perpetrated through the use of common documentation, such as the documents employed to memorialize each putative class member's mortgage loan, full participation in the loan process alone is sufficient to establish the due diligence element" of an equitable tolling argument.  Comm. Bank, 795 F.3d at 404 (citing

for insurance claims."); Michele Derus, MGIC Posts 40% Jump in Profits; Employment Gains Credited with Drop in Mortgage Delinquency, MILWAUKEE J. SENTINEL, Apr. 15, 2005, at 3 ("[M]ortgage insurers . . . have been targeted on alleged violations of [RESPA]. . . . [I]nsurance regulators in Colorado and North Carolina are considering probes into mortgage reinsurance arrangements: specifically, if illegal kickbacks are involved.")."

Cunningham v. M & T Bank Corp., 2013 WL 5876337 (M.D. Pa. Oct. 30, 2013) (denying the defendants' motion to dismiss a case with facts substantially similar to those in the instant action, where defendants moved to dismiss plaintiffs' RESPA claims for violation of the statute of limitations and the court "conclude[d] that plaintiffs have stated a plausible case for equitable tolling of the RESPA statute of limitations. Hence, the court will deny the defendants' motions to dismiss. Plaintiffs have pled facts from which a jury could find that the mortgage documents misled them and improperly cloaked the fraudulent reinsurance relationship with an appearance of propriety, 'lulling' the plaintiffs into a false sense of legality . . . In addition, plaintiffs have [alleged that] they fully participated in all aspects of the mortgage loan transaction and reviewed all relevant documents but that they were nonetheless unable to discover the RESPA violation.")). The Court of Appeals for the Third Circuit found the logic of the District Court for the Norther District of Georgia to be persuasive on this point. Id. (citing Bradford v. WR Starkey Mortg., LLP, 2008 WL 4501957 (N.D. Ga. Feb. 22, 2008) (holding that "[p]laintiff had no reason to suspect that defendant, or any other lender, might be improperly marking-up settlement charges, and the due diligence requirement does not demand that plaintiff inquire about the various fees at issue. . . Having flouted the regulation, defendant cannot now try to penalize plaintiff for trusting the validity of the settlement costs delineated on his HUD–1 Statement")).

The Court is mindful of the Court of Appeals for the Third Circuit's admonition that tolling inquiries are generally fact-intensive. See id. at 389 (citing Comm. Bank of N. VA, 622 F.3d at 301–02 (stating that "whether a particular party is eligible for equitable tolling generally requires consideration of evidence beyond the pleadings.")). In light of the recently-issue precedential decision of Community Bank III, the Court concludes that Plaintiffs have alleged

sufficient facts to establish a plausible claim that they exercised reasonable diligence but were

unable to find and avoid the storm, satisfying prong two of <u>Cetel</u> at the Rule 12(b) stage.  <u>Cetel</u>,

460 F.3d at 507.  Plaintiffs have pleaded full participation in the loan process; nothing more is

required at the pleadings stage.  Therefore, Plaintiffs have stated a plausible case for the

application of the injury-discovery rule with respect to their RICO claims.  The Court will deny

Defendants' Motion to Dismiss based on the application of the injury-discovery rule, based on

the current record.[5]

However, the Court hesitates to allow this matter to proceed to full merits discovery,

consuming both the parties' and the Court's time and resources.  The parties will be given leave

to proceed to limited discovery as to the statute of limitations, injury-discovery, and equitable

tolling issues alone.

ii.   <u>Standing</u>

Defendants next argue that Plaintiffs lack standing to bring claims pursuant to RICO,

pursuant to the filed rate doctrine.  (Defs.' Mem. at 17-19).  In their briefing, Defendants attempt

to distinguish the instant case from <u>Alston v. Countrywide Fin. Corp.</u>, 585 F.3d 753 (3d Cir.

2009), which evaluated a claim under RESPA and found that "the filed rate doctrine simply does

not apply" in circumstances where plaintiffs "challenge [the defendant's] allegedly wrongful

conduct, not the reasonableness or propriety of the rate that triggered that conduct."  585 F.3d at

765.  Defendants later submitted a Notice of Recently Issued Supplemental Authority, calling the

---

[5] As the pleadings are sufficient to survive a Rule 12(b) motion with respect to the injury-discovery rule, the Court does not address the arguments concerning equitable tolling and the fraudulent concealment doctrine.  Neither does the Court address the potential tolling of the statute of limitations pursuant to <u>American Pipe</u>, 414 U.S. 538, and its progeny.  If it is later established that the date of accrual of Plaintiffs' claims precedes January 14, 2011, the Court will then address the effect on the statute of limitations of the pendency of <u>Riddle v. Bank of America Corp, et al.</u>, No. 12-cv-1740 and the other suits "alleging identical schemes" noted by Defendants in their briefing.  (Defs.' Mem. at 10).

Court's attention to <u>Rothstein v. Balboa Ins. Co.</u>, 794 F.3d 256 (2d Cir. 2015), which held that the plaintiffs' RESPA and RICO claims relating to lender-placed hazard insurance were barred by the filed rate doctrine. (Doc. 21).

"The filed rate doctrine provides that a rate filed with and approved by a governing regulatory agency is unassailable in judicial proceedings brought by ratepayers." <u>Alston</u>, 585 F.3d at 763. "The classic example of the preemptive power of the doctrine occurs when a customer makes a claim for a rate that was not filed—such claims are barred." <u>Id</u>. (citations omitted). The filed rate doctrine applies in circumstances where a plaintiff is challenging the "reasonableness or propriety of the rate[s]" themselves. <u>Id</u>. at 765.

In <u>Alston</u>, the Court of Appeals for the Third Circuit considered allegations of wrongful conduct involving unlawful kickbacks. "Plaintiffs may not sue . . . if they simply think that the price they paid for their settlement services was unfair," the Court found, but plaintiffs "may allege a violation of fair business practices through the use of illegal kickback payments. The filed-rate doctrine bars suit from the former class of plaintiffs and not the latter." <u>Id</u>. at 764 (internal quotation marks and citation omitted). Defendants contend that <u>Alston</u> is limited to its facts – namely, that it does not apply beyond the RESPA context. (Defs.' Mem. at 18-19). The Court is not persuaded.

District courts within the Third Circuit have found <u>Alston</u>'s applicability to extend beyond the RESPA context. <u>See</u>, <u>e.g.</u>, <u>Santos v. Carrington Mortg. Serv.</u>, 2015 WL 4162443 (D.N.J. July 8, 2015) (holding that the filed rate doctrine does not bar the plaintiff's claims pursuant to the New Jersey Consumer Fraud Act ("NJCFA"), the Truth in Lending Act, and RICO, all relating to alleged kickbacks in the forced-placed hazard insurance context, as the plaintiffs challenged the defendants' conduct, "not the reasonableness or propriety of the rate

itself"); <u>DiGiacomo v. Statebridge Co., LLC</u>, 2015 WL 3904594 (D.N.J. June 25, 2015) (holding

that the filed rate doctrine does not bar the plaintiff's claims for breach of contract, breach of

implied covenant of good faith and fair dealing, violation of the NJCFA, breach of fiduciary

duty, and RICO violations, all relating to alleged kickbacks in the forced-placed insurance

context, as, defendants may simultaneously impose "a rate that regulators deem reasonable,. . .

[and] engage in conduct that violates, as Plaintiff alleges, the NJCFA or RICO statutes or

Defendants' contractual and fiduciary obligations."); <u>Laffan v. Santander Bank, N.A.</u>, 2014 WL

2693158 (E.D. Pa. June 12, 2014) (declining to find that the filed rate doctrine bars the plaintiffs'

claims for breach of implied covenant of good faith and fair dealing, breach of contract, breach

of fiduciary duty/misappropriation of funds held in trust, and violation of the NJCFA, all relating

to alleged kickbacks and overcharges in the forced-placed insurance context, as the filed rate

doctrine does not apply where "a plaintiff challenges the defendant's allegedly wrongful

conduct, not the reasonableness of the rate."); <u>Lauren v. PNC Bank, N.A.</u>, 2013 WL 5565511

(W.D. Pa Oct. 8, 2013) (finding the defendants' reliance on <u>Alston</u> to be unavailing, as the

plaintiff challenged their alleged unlawful misconduct, not the reasonableness of the rate of the

insurance policy); <u>Gallo v. PHH Mortg. Corp.</u>, 916 F.Supp.2d 537 (D.N.J. 2012) ("Although

<u>Alston</u> was decided in the context of a case where the plaintiffs alleged a violation of the Real

Estate Settlement Procedures Act and no such claim is made here, the Court still finds this case

instructive in resolving the filed rate doctrine issue, notwithstanding this distinction.").

Defendants' reliance on <u>Lombardi v. Allstate Ins. Co</u>, 2011 WL 294506 (W.D. Pa. 2011),

and their failure to address the myriad district court cases in which <u>Alston</u> is held to extend

beyond the context of RESPA, is unpersuasive.  (<u>Id</u>. at 19).  Unlike here, the plaintiff in

<u>Lombardi</u> indeed was challenging the reasonableness of his insurance rates.  2011 WL 294506,

*7 ("When examined closely, Lombardi's claims under both Count I (breach of contract) and Count II (UTPCPL) focus upon the 'unfairness' of the rates [his deceased sister] paid to Allstate in exchange for what she received. He characterizes the premiums as 'excessive' and complains that they were not calculate accurately."). Also unlike here, he was not alleging that the defendants engaged in independent misconduct. Rothstein is equally unavailing, as it is in direct tension with the prevailing precedent in the Third Circuit, Alston.

Plaintiffs allege that Defendants engaged in a conspiracy to defraud home mortgage borrowers into funding sham captive reinsurance arrangements through illegal kickbacks. Simply put, "[t]he filed rate doctrine cannot offer any protection against such a charge." See DiGiacomo, 2015 WL 3904594, *7. Defendants' Motion to Dismiss Plaintiff's Complaint based on the filed rate doctrine will be denied.

iii.    Failure to Plead a RICO Violation

To plead a RICO claim, a plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004) (citing Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1989)). Defendants argue that Plaintiffs have failed to state a RICO claim by omitting sufficient factual allegations to establish the elements of a valid "enterprise" or "any predicate acts of racketeering." (Defs.' Mem. at 19). The Court disagrees.

a.    Enterprise

The RICO statute defines "enterprise" to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Plaintiffs allege that Defendants are an "association-in-fact," (Compl. at ¶ 153); such an association must possess "'at least three

structural features: a purpose, relationships among those associated in the enterprise, and longevity sufficient to permit these associations to pursue the enterprise's purpose.'" In Re Ins. Brokerage Antitrust Lit., 618 F.3d 300 (3d Cir. 2010) (quoting Boyle v. United States, 556 U.S. 938 (2009)).  Defendants attack the sufficiency of the pleadings with respect to establishing the common purpose and relationships prongs of the Boyle/Insurance Brokerage tests.  (Defs.' Mem. at 20-22).

Plaintiffs allege that the relevant enterprise consists of the Private Mortgage Insurers and Defendants, including their respective officers, directors, employees, agents, and indirect subsidiaries.  (Compl. at ¶ 153).  Defendants argue that Plaintiffs allege a "hub and spoke" enterprise structure, with the lenders (BAC/BANA) in the center, and the private mortgage insurers at the spokes.  (Defs.' Mem. at 20).  They posit that Plaintiffs have made no allegations of a relationship between the private mortgage insurers themselves, and thus In Re Ins. Brokerage Antitrust Lit., 618 F.3d 300, compels the finding that the asserted hub and spokes lack a "unifying rim."  (Id.).  Without allegations of a rim to the structure, there can be no enterprise. (Id.).

Boyle holds that while an "enterprise" under RICO must function as a continuing unit, the term is otherwise interpreted broadly.  See In Re Ins. Brokerage Antitrust Lit., 618 F.3d at 368.  "After Boyle, an association-in-fact enterprise need have no formal hierarchy or means for decision-making, and no purpose or economic significance beyond or independent of the group's pattern of racketeering activity."  Id. (internal quotations omitted).  The Boyle court made clear what is necessary at the pleading stage, stating that:

> [t]he enterprise element of RICO claims is a close analogue of [the Sherman
> Act's] § 1[] agreement element. Unless a plaintiff is required at the pleading stage
> to suggest plausibly the existence of an enterprise structure—unless a plaintiff
> must "allege something more than the fact that individuals were all engaged in the

same type of illicit conduct during the same time period,"—the RICO statute's allowance for association-in-fact enterprises becomes an open gateway to the imposition of potentially massive costs on numerous defendants, regardless of whether there is even a hint of the collaboration necessary to trigger liability.

Id. at 370 (quoting Elsevier Inc. v. W.H.P.R., Inc., 692 F.Supp.2d 297, 307 (S.D.N.Y 2010)).

In Insurance Brokerage, purchasers of commercial and employee benefit insurance brought an action against insurers and insurance brokers, claiming unlawful schemes under the RICO statute to allocate purchasers among particular groups of insurers. The purchasers alleged two types of association-in-fact enterprises seemingly relevant to the instant case. First, the purchasers alleged a number of "broker-centered" enterprises, in which brokers colluded with their insurer-partners to deceptively steer clients to preferred insurer-partners in exchange for contingent commission payments. Second, the purchasers alleged a "Marsh-centered" enterprise, in which insurer-broker Marsh & McLennan ("Marsh") solicited false bids on policies and received improper contingent commission payments in exchange for steering business to a select group of insurers. The defendants moved to dismiss the complaint for failure to state a valid association-in-fact enterprise. The Court of Appeals for the Third Circuit held that while the broker-centered enterprise did not meet the requisites of a valid RICO enterprise, the Marsh-centered enterprise did.

In deciding what constituted an association-in-fact enterprise, the court in Insurance Brokerage explained that the Supreme Court in Boyle found that "enterprises" do not require a formal structure or a systematic plan. Id. at 377. Instead, enterprise decisions may be made on an ad hoc basis by any number of methods, so long as the enterprise consists of a group with a common purpose and course of conduct. Id. at 365, 377 (citing United States v. Turkette, 452 U.S. 576, 583 (1981)). Moreover, in Insurance Brokerage, the court noted that "proof of a

pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." Id. (citing Boyle, 556 U.S. at 951).

In Insurance Brokerage, the broker-centered scheme created a "hub and spoke" enterprise with the brokers as the hub and the insurance companies as the spokes. The court held that this alleged enterprise lacked a "unifying rim" in the form of collaboration among the insurer-partners. In short, the allegations implied parallel conduct between the insurers with no common purpose among them, rather than the concerted action as required by Boyle. The facts, therefore, did not support an inference that the insurers associated together for the common purpose of engaging in a course of conduct. Rather, they supported an inference of the existence of multiple, bilateral agreements – or even, potentially, smaller enterprises – that did not work in concert with one another.

In contrast, the Marsh-centered enterprise did allege a "rim" surrounding the hub-and-spoke configuration. Marsh prepared brokering plans that governed the placement of insurance contracts up for renewal and assigned business to specific insurers at target prices. Id. at 377. This "plausibly evinces an expectation of reciprocity and cooperation among the insurers." Id. at 376. Since Boyle disavowed the need for any particular hierarchical or organizational structure, the members of the scheme were not required to have fixed roles. Instead, the reciprocal bid-rigging adequately suggested relationships among the insurers:

> In our view, the alleged agreement by insurers to provide sham bids plausibly suggests an interrelationship among the insurers—mediated through Marsh—in pursuit of achieving greater business and profits by means of deceiving insurance purchasers. Through this interrelationship, the insurers were allegedly able to advance this common interest to a greater extent than would have been possible on the strength of the bilateral relationships between Marsh and each broker alone.

Id. at 377.  Ultimately, the court was satisfied that a relationship based on this reciprocal bid-rigging constituted an association-in-fact enterprise.  Id. at 378.

The Court finds the enterprise alleged by Plaintiffs to be factually distinct from the "broker-centered" enterprise alleged, and deemed insufficient, in Insurance Brokerage.  Here, Plaintiffs allege more than bilateral agreements between lenders and private mortgage insurers.  Rather, Plaintiffs allege the existence of a continuous unit, depicted graphically in the Complaint.  (Compl. at ¶ 81).  It is alleged that BAC and BANA agreed to refer clients to third-party private mortgage insurers, on a rotating basis, only if those private mortgage insurers entered into reinsurance agreements with BARC.  (Compl. at ¶¶ 9, 12-13, 73).  The private mortgage insurers then ceded a percentage of client premiums to BARC, and, closing the proverbial circle, BARC funneled that money back to BAC/BANA.  (Compl. at ¶¶ 9, 12-13, 73, 78, 81).

Importantly, Plaintiffs allege that the business was allocated on a rotation.  (Compl. at ¶¶ 9, 73, 78).  While Insurance Brokerage did hold that "competitors who independently engaged in similar types of transactions with the same firm" cannot be considered associates in a common enterprise, the allegation of a "rotation" refutes the contention that the private mortgage insurers operated "independently."  In Re Ins. Brokerage Antitrust Lit., 618 F.3d at 375.  Unlike simple parallel conduct, each private mortgage insurer is alleged to have waited its turn to participate in this larger scheme, which had the common purpose of perpetuating borrowers' payment of premiums to them, a portion of which was directed back to their original lenders in exchange for, according to Plaintiffs, nothing at all.  It need not be the case that the conduct of the enterprise benefit every member identically.  Participation in the scheme benefitted the private mortgage insurers because it assured them a steady stream of business in the form of referrals from major lenders.  (Compl. at ¶¶ 12, 39).  The same course of conduct benefited BAC and BANA because

it funneled allegedly unearned money back into their coffers.  (Compl. at ¶ 15).  The course of conduct and larger purpose, nonetheless, were common to all – to perpetuate a system whereby borrowers paid insurance premiums, only 75% of which meaningfully contributed to "insurance" coverage.

Lastly, contrary to the implication of Defendants' arguments, there is no need for a plaintiff to prove that each conspirator had contact with all other members.  Indeed, a RICO enterprise may be shown through proof of a hierarchical structure and without evidence that the lower level members of the enterprise collaborated directly with each other.  See, e.g., United States v. Friedman, 854 F.2d 535, 562–63 (2d Cir. 1988) ("So long as the alleged RICO co-conspirators have agreed to participate in the affairs of the same enterprise, the mere fact that they do not conspire directly with each other 'does not convert the single agreement to conduct the affairs of an enterprise through a pattern of racketeering activity into multiple conspiracies.'"); United States v. De Peri, 778 F.2d 963, 975 (3d Cir. 1985) ("This knowledge [of the identities of all other participants] is not essential to the finding of a RICO conspiracy. As we said in Riccobene, '[i]t is well established that one conspirator need not know the identities of all his coconspirators, nor be aware of all the details of the conspiracy in order to be found to have agreed to participate in it.' ") (quoting United States v. Riccobene, 709 F.2d 214, 225 (3d Cir. 1983)).  Thus, Plaintiffs need not plead additional facts to show communication between the various private mortgage insurers in order to establish the existence of an enterprise.

Based on the record before the Court, Defendants' Motion to Dismiss based on insufficient allegation of a RICO enterprise will be denied.

b.  Predicate Acts

Plaintiffs must also sufficiently plead a pattern of racketeering activity.  Lum v. Bank of Am., 361 F.3d at 223.  A pattern of racketeering activity requires at least two predicate acts of racketeering.  Id. (citing 18 U.S.C. § 1961(5)).  These predicate acts of racketeering may include, *inter alia*, federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343.  Id. (citing 18 U.S.C. § 1961(1); Saporito v. Combustion Eng'g, Inc., 843 F.2d 666, 676 (3d Cir. 1988), vacated on other grounds, 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989)).  Defendants argue that Plaintiffs have failed to plead predicate acts as defined under the law.  (Defs.' Mem. at 22-24).

Plaintiffs respond that they allege that Defendants, in conjunction with the private mortgage insurers, committed the predicate acts of mail and wire fraud.  (Pls.' Resp. at 20). "The elements of mail and wire fraud are (1) a scheme or artifice to defraud for the purpose of obtaining money or property, (2) participation by the defendant with specific intent to defraud, and (3) use of the mails or wire transmissions in furtherance of the scheme."  Nat'l Securities Systems, Inc. v. Iola, 700 F.3d 65, 105 (3d Cir. 2012).

A "scheme or artifice to defraud" must involve "'some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.'"  Camiolo v. State Farm Fire & Cas. Co., 334 F.3d 345, 364 (3d Cir. 2003) (quoting Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d Cir.1991)).  An affirmative misrepresentation is not required.  Id.  However, "the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane or overreaching.'"  Id.

Plaintiffs allege the following:

in both mortgage documents and periodic account statements that were transmitted to Plaintiffs and the Class by Defendants and/or their agents, Defendants made false and misleading representations, which hid the true nature of the captive reinsurance arrangements and the illegal kickbacks. . . . Defendants'

scheme . . . included making false and misleading representations regarding this captive reinsurance arrangement in the mortgage documents provided to borrowers like Plaintiffs and the Class. The scheme also included the provision of misleading representation to borrowers, like Plaintiffs and the Class, in periodic account statements that were transmitted to borrowers by Defendants and their agents. . . . Defendants' statements [in the mortgage documents] . . . were false and misleading for a number of reasons. First, as described in detail above, the actual reinsurance services provided by [BARC] were a sham, with little or no risk being assumed by the reinsurer. Second, the disclosure does not alert the borrower to the fact that the private mortgage insurer was selected by Bank of America because of its willingness to pay kickbacks to [BARC] and to participate in the captive reinsurance scheme. Third, the reinsurance premiums (or kickbacks) from the Private Mortgage Insurers to Bank of America were per se illegal under RESPA. Fourth, as set forth above and in direct contravention to the language of the disclosure, borrowers were forced to pay more for private mortgage insurance because the private mortgage insurance premiums had been inflated by and included the kickbacks to lenders.

(Compl. at ¶¶ 17, 83, 111).

Accepting the Complaint's well-pleaded facts as true –as we must at this stage— Plaintiffs have sufficiently plead a scheme or artifice to defraud. They allege that they were informed of their obligation to pay premiums in exchange for receipt of primary mortgage insurance. (Compl. at ¶¶ 110-11). They were told what mortgage insurance, in fact, provides. (Id. at ¶ 110) ("Mortgage insurance reimburses the lender for losses the lender may incur if you fail to make the payment on your loan as required."). They were notified that their lender:

may, directly or through an affiliated company (the "Reinsurance Company"), enter into a reinsurance or other risk sharing agreement with the insurance company that will be providing Mortgage Insurance covering your loan. Under such an agreement, the Reinsurance Company may assume a portion of the risk associated with such Mortgage Insurance. In exchange for its assumption of such risk, the Reinsurance Company may receive a percentage of the mortgage insurance premium paid to obtain the Mortgage Insurance covering your loan. **The reinsurance or other such risk sharing agreement will <u>not</u> increase the mortgage insurance premium you pay or increase the period for which Mortgage Insurance is required**.

(Id. at ¶ 110) (emphasis in original). Plaintiffs allege that these statements were reasonably calculated to deceive, as BARC failed to "assume a portion of the risk" in exchange for a

percentage of the premium paid. Further, they allege that the premium was artificially inflated as a result of the scheme, and thus the utilization of a captive reinsurance company, in contradiction to the statements in the loan documents, did increase their mortgage premium. (Compl. at ¶ 112). It simply did so from Day 1, as all parties involved intended to utilize a captive reinsurance scheme, as opposed to on Day X, some later date on which the reinsurance agreement was officially signed. Plaintiffs' pleadings pass muster in this respect.

Defendants additionally argue that Plaintiffs fail to allege any fraud *through the mail or wires*. (Defs.' Mem. at 24). The Court of Appeals for the Third Circuit has held that "in civil RICO complaints based on predicate acts of mail fraud. . . completely 'innocent' mailings can satisfy the mailing element." Tabas v. Tabas, 47 F.3d 1280, 1294 n. 18 (3d Cir. 1995) (quoting Kehr, 926 F.2d at 1416). "'In cases predicated on mail fraud ... [t]he gravamen of the offense is the scheme to defraud,' and that the mailing element is satisfied by 'any mailing that is incident to an essential part of the scheme[.]'" AMA Realty LLC v. 9440 Fairview Ave. LLC, 2014 WL 1783099, at *5 (D.N.J. May 2, 2014) (quoting Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 647 (2008)).

Plaintiffs allege that Defendants':

> use of the mails and/or wires formed a central feature of the scheme and included transmitting borrowers' mortgage documents and periodic account statements via mail, electronic mail, and facsimile, which fraudulently represented or omitted the true nature of the reinsurance arrangement, and in particular the illegal kickbacks that were paid to Bank of America. Hundreds, and likely thousands, of mortgage documents and periodic account statements have been transmitted to borrowers across state lines. Each of these statements fraudulently represented the true nature of the reinsurance arrangement and the kickbacks paid by the Private Mortgage Insurers (and funded by borrowers) to Bank of America.

(Compl. at 108-09). Given the liberal legal standard, these pleadings are sufficient to defeat Defendant's Rule 12(b) motion to Dismiss for failure to state a violation under the RICO Act.

iv.     Plaintiffs' other claim

Defendants argue that Plaintiff's conspiracy to commit a RICO violation claim may not succeed, as the underlying RICO claim lacks merit.  As the Court is denying Defendants' motion to dismiss the RICO claim, this argument is moot.

Defendants assert that Plaintiffs' unjust enrichment claims should be dismissed "for the threshold reason that 'the quasi-contractual doctrine of unjust enrichment [is] inapplicable when the relationship between parties is founded on a written agreement.'"  (Defs.' Mem. at 25 (quoting Benefit Trust Life Ins. Co. v. Union Nat'l Bank of Pittsburgh, 776 F.2d 1174, 1177 (3d Cir. 1985)).  A cause of action for unjust enrichment lies only when the transaction underlying the dispute is not subject to a contract.  See Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co., Inc., 933 A.2d 664, 669 (Pa.Super.Ct.2007).

As was the case in Menichino v. Citibank, N.A., 2014 WL 462622, at *5 (W.D. Pa. Feb. 5, 2014), the only Defendants with whom Plaintiffs were in privity of contract were BAC and BANA, the mortgagees.  It is similarly the case that:

> [e]ven though the mortgage agreements stated that the mortgagees would use a
> portion of Plaintiffs' monthly mortgage payments to purchase primary mortgage
> insurance, Plaintiffs were not parties to the primary mortgage insurance contracts,
> nor were they entitled to any rights under those contracts. Similarly, Plaintiffs had
> no involvement with, were entitled to no rights in, and received no benefits under,
> the disputed reinsurance arrangements between the PMIs and captive reinsurers.
> Unlike cases where unjust enrichment claims were found not to lie because the
> terms of the contract between the parties governed their dispute, . . . the Plaintiffs
> here were contracting parties only to the agreement that formed the first link in
> the chain. They had no involvement in or rights or obligations under the
> subsequent contracts that give rise to the crux of the dispute. Thus, Plaintiffs have
> sufficiently pled that there was no contract between themselves and the parties to
> the purported kickback scheme (the respective mortgagees, captive reinsurers, and
> PMIs connected to their residential mortgages) that is on point or otherwise
> governs the disputed transaction.

<u>Menichino</u>, 2014 WL 462622, at *5. As Plaintiffs here were not in privity of contract with the private mortgage insurers, or BARC, their pleadings are sufficient with respect to their state law claim for unjust enrichment.[6]

Defendants also argue that the statute of limitations bars unjust enrichment claims under both Pennsylvania and Michigan law. (Defs.' Mem. at 25). Plaintiffs are correct that Pennsylvania courts have tolled the statute of limitations for unjust enrichment claims pursuant to the injury discovery rule, addressed in great detail *supra*. <u>Ruddy v. Mt. Penn Borough Mun. Auth.</u>, 2014 WL 1852002 (Pa. Commw. Ct. May 6, 2014). Defendants do not establish when an unjust enrichment claim – which has a 6-year statute of limitations in Michigan – accrues under that state's laws. <u>See</u> <u>Trudel v. Allen Park</u>, 2013 WL 6037152 (Mich.Ct.App. Nov. 14, 2013) ("Defendants fail to present an argument challenging the proposition that a defendant's ongoing retention of benefits in this context is a continuing wrong that may extend the limitation period."). Thus, Defendants' Motion to Dismiss on these last bases will be denied.

## **II. ORDER**

For the reasons stated above, Defendants' Motion to Dismiss (Doc. 14) is DENIED.

IT IS SO ORDERED.

December 22, 2015             s\Cathy Bissoon
                                       Cathy Bissoon
                                       United States District Judge

cc (via ECF email notification):

---

[6] A more detailed review of the variations in state law may be required at the class certification stage, <u>see</u> <u>Sullivan v. DB Investments, Inc.</u>, 667 F.3d 273, 301–03 (3d Cir. 2011).

All Counsel of Record